# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 7, 2022

Lyle W. Cayce
Clerk

No. 21-50253

KENNETH NEWMAN, *individually and, on behalf of* ALL OTHERS
SIMILARLY SITUATED,

*Plaintiff—Appellee*,

CYPRESS ENVIRONMENTAL MANAGEMENT-TIR, L.L.C.,

*Intervenor—Appellee*,

*versus*

PLAINS ALL AMERICAN PIPELINE, L.P.,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:19-CV-244

Before KING, COSTA, and WILLETT, *Circuit Judges*.
DON R. WILLETT, *Circuit Judge*:

A pipeline-inspection firm hired some inspectors. Their employment agreement contained an arbitration provision. The firm sent the inspectors off to work for a client company. The inspectors eventually sued the client for alleged Fair Labor Standards Act violations. They did not sue their firm. The client moved to compel arbitration. The district court denied its motion,

No. 21-50253

reasoning that the client could not enforce the arbitration agreement between the inspectors and their firm. The firm intervened, and the client company appealed. For the reasons below, we AFFIRM.

I

Cypress Environmental Management-TIR, L.L.C. ("Cypress"), staffs pipeline inspectors to various client-company projects. It hired Newman and his co-plaintiffs—who we will collectively refer to as Newman, for simplicity's sake—to work as independent pipeline inspectors for Plains All American Pipeline ("Plains"). As part of his job, Newman signed an Employment Agreement with Cypress. The Employment Agreement contained an arbitration agreement. Newman and Cypress agreed "that the Federal Arbitration Act ('FAA') applie[d]"; "to arbitrate all claims that have arisen or will arise out of [his] employment with or termination from [Cypress]"; and that any "[a]rbitration [would] be conducted in accordance with the American Arbitration Association Employment Arbitration Rules," the AAA Rules.[1]

Newman's Employment Agreement did not expressly mention Plains. But it did specify that Cypress had hired Newman "based on a specific project" and "for a designated customer." It also incorporated by reference a certain Pay Letter. This Pay Letter named Plains as the designated customer that Newman was to work for.

Newman never signed any agreement with Plains. But a Cypress subsidiary did. That subsidiary, Tulsa Inspection Resources, LLC ("TIR"), signed the contract that governed Cypress's business relationship with

---

[1] All but one other plaintiff entered into the same Employment Agreement. The other plaintiff, John Smith, signed a substantively identical arbitration provision as part of his Employment Agreement.

No. 21-50253

Plains. As part of that contract, TIR agreed to indemnify Plains for any claims relating to "any violation or alleged violation of state or federal law related to the payment, employment, or employment status of any of [Cypress's] employees."

Newman eventually brought a collective action against Plains. He alleged that Plains owes him unpaid overtime under the FLSA. Conspicuously absent from his complaint were any claims against Cypress. After Newman filed suit, Plains moved to compel arbitration. The district court did not compel arbitration, and in a detailed order it reasoned that our prior decision in *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*[2] was distinguishable; that Plains was not a third-party beneficiary to the Newman–Cypress Employment Agreement under Texas law; and that it would not allow Plains to enforce the arbitration agreement using intertwined-claims estoppel.

After the district court denied Plains's motion to compel arbitration, Cypress moved to intervene. The district court granted its motion.[3] Plains then appealed the district court's denial of its motion to compel arbitration.

---

[2] 866 F.3d 709 (5th Cir. 2017).

[3] The district court denied Cypress's motion to compel. Cypress has appealed, but we denied Plains and Cypress's motion to consolidate that appeal with this one.

No. 21-50253

## II

We review the denial of a motion to compel arbitration de novo[4]—as we do contract-interpretation issues generally.[5] As for whether the district court properly refused to equitably enforce a contract, we review that for abuse of discretion.[6]

## III

The parties vigorously dispute whether the district court should have decided whether Plains can enforce the Newman–Cypress arbitration agreement. Cypress admits that deciding whether an arbitration agreement exists between the parties is "always for the court."[7] But both it and Plains see a distinction between deciding whether an arbitration agreement *exists* (a question for the court) and deciding who it is *enforceable against* (a question they say is delegable to the arbitrator). Newman sees no distinction. Under controlling caselaw, says Newman, we must decide whether Plains can enforce the Newman–Cypress arbitration agreement; not an arbitrator.

We agree with Newman. When a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties. Therefore, deciding an arbitration agreement's enforceability between parties remains a question for courts.

---

[4] *Kubala v. Supreme Prod. Svcs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016).

[5] *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021).

[6] *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("[W]hether to utilize equitable estoppel in this fashion is within the district court's discretion; we review to determine only whether it has been abused.").

[7] Plains never squarely admits as much.

No. 21-50253

A

We have explained before that courts must decide "at the outset" whether an enforceable arbitration agreement exists at all.[8] The parties cannot delegate disputes over "the very *existence* of an[] [arbitration] agreement."[9] The Supreme Court recently "reaffirmed" this rule.[10] It explained in *Henry Schein, Inc. v. Archer and White Sales, Inc.* that the FAA requires courts to first "determine[] whether a valid arbitration agreement exists" before granting motions to compel arbitration.[11]

To that end, deciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin. We said as much in *Sherer v. Green Tree Servicing LLC*.[12] Under "the first step in determining whether a valid agreement to arbitrate exists," we look first to "the 'terms of the agreement,'" which "dictate '[w]ho is actually bound by an arbitration agreement.'"[13] Then, "[i]f that fails," we "look to theories such as equitable estoppel to determine whether a nonsignatory may compel arbitration."[14] Under both the Supreme Court's and our caselaw, then,

---

[8] *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 514 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003)).

[9] *Id.* (quoting *Will-Drill*, 352 F.3d at 218) (emphasis added).

[10] *Id.* at 515 n.4.

[11] 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2). At oral argument, Newman's counsel contended that *state* law governs whether enforceability between the parties is a first-step formation question, for the courts, or a second-step arbitrability question, potentially for arbitrators. As *Henry Schein* makes plain, though, it is *federal* law—the FAA, itself—that governs. *See id.* (pointing to the FAA's text as what compels courts to decide whether a valid arbitration agreement exists).

[12] 548 F.3d 379 (5th Cir. 2008) (per curiam).

[13] *Id.* at 382.

[14] *Id.*; *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been

No. 21-50253

Newman has the better view. It is up to us—not an arbitrator—to decide whether Plains can enforce the Newman–Cypress arbitration agreement.

B

Still, Plains and Cypress disagree. They contend that part of our decision in *Brittania-U* supports that deciding an arbitration agreement's enforceability between the parties is an arbitrability question, which would make it delegable to an arbitrator. We disagree and, in any event, find that *Brittania-U* addressed a distinguishable situation.

In *Brittania-U*, a disappointed bidder for some oil leases sued the seller and two of its agents involved in the bidding process. As part of the bidding process, the bidder and seller had signed an arbitration agreement. That arbitration agreement contained a delegation clause: a clause that delegates arbitrability questions to the arbitrator. The seller's agents never signed the bidder–seller arbitration agreement. Nonetheless, both the seller and its nonsignatory agents moved to compel arbitration based on it.[15]

We held that they could.[16] We noted that before we could reach whether the delegation clause was valid, we had to decide the first-step, formation question.[17] Specific to the agents, that meant looking to "'background principles' of state contract law," like equitable estoppel, to see if they could enforce the bidder–seller arbitration agreement as

recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.").

[15] *See* 866 F.3d at 711–12; *see also id.* at 714 (explaining that "a delegation clause giv[es] the arbitrator the primary power to rule on the arbitrability [question]" (quoting *Kubala*, 830 F.3d at 201)).

[16] *Id.* at 715.

[17] *Id.* at 714.

nonsignatories.[18] When we looked to those background principles, we found the Second Circuit's decision in *Contec v. Remote Solution, Co.* "instructive."[19] In that case the Second Circuit held that a nonsignatory—a corporation's successor in interest—could enforce an arbitration agreement since it had a "sufficient relationship" with both the predecessor-in-interest signatory "and to the rights created under the agreement."[20] We found *Contec* indistinguishable in *Brittania-U*: "Like in *Contec*, the [seller and its agents]—a signatory and two nonsignatories—are attempting to enforce the arbitration provision against [the signatory bidder]."[21] Since we also held that the delegation clause was valid, the seller's agents could therefore compel arbitration.[22]

But we are not faced today with the same situation we confronted in *Brittania-U*. The district court below correctly explained what made *Brittania-U* different: in that case, an "agency relationship" existed between the agents and the seller, and "estoppel principles were at play." As we explain more thoroughly below, those facts are not present here. And, even more unlike *Brittania-U*, Cypress was not even a party to this suit until it intervened. Newman has still brought no claims against it.

But to the principal thrust of Plains and Cypress's argument—that *Brittania-U* held that enforceability between the parties is a second-step, arbitrability question—we cannot agree. We already highlighted above how

---

[18] *Id.* at 715 (quoting *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014)).

[19] *Id.* (citing 398 F.3d 205, 211 (2d Cir. 2005)).

[20] *See* 398 F.3d at 209–211.

[21] *Brittania-U*, 866 F.3d at 715.

[22] *Id.* at 714–15.

*Brittania-U* supports that we decide that issue as part of the first-step, formation question. What supports Plains and Cypress's argument is nothing more than some imprecise language. True, we did say in *Brittania-U* that we had to "first determine whether claims against [the agents] were . . . clearly and unmistakably delegated to the arbitrator" before we could address whether the agents could enforce the bidder–seller arbitration agreement as nonsignatories.[23] But in holding that they could, we explicitly relied on *Contec*.[24] And in *Contec*, the Second Circuit plainly reasoned that enforceability goes to the first-step, formation question that is determined by the courts.[25]

But even if *Brittania-U* could not be reconciled with our decision today, we would still be bound to disagree with Plains and Cypress. In general, the rule of orderliness binds us to follow a prior panel's decision on an issue.[26] But when two published panel decisions conflict, we must follow the earlier.[27] Plains and Cypress's reading of *Brittania-U* would create just such a conflict between it and our earlier decision in *Sherer*.[28] So, we are

---

[23] *See id.* at 709.

[24] *Id.* at 715.

[25] 398 F.3d at 209 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995)); *see also id.* ("[J]ust because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory.").

[26] *See, e.g.*, *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 385 (5th Cir. 2011) ("[Our] rule of orderliness prevents one panel from overruling the decision of a prior panel.").

[27] *GlobeRanger Corp. v. Software AG USA, Inc.*, 836 F.3d 477, 497 (5th Cir. 2016).

[28] *See Sherer*, 548 F.3d at 382 (explaining that "whether a valid agreement to arbitrate exists" turns on whether it can be enforced in *either* law or equity). The rule of orderliness applies as equally to a panel's implicit reasoning as it does to its express holdings. *See Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000) ("[T]o

hemmed in. We could not read *Brittania-U* as Plains and Cypress invite us to even if we were so inclined.

## IV

Still, our work is far from done. We explained in *Kubala v. Supreme Production Services, Inc.* that the first step to decide a motion to compel arbitration is to ask a state-law, contract-formation question: Did "the *parties* enter[] into *any arbitration agreement at all*."[29] In cases like *Kubala*, where Texas law deemed that both parties accepted the same arbitration agreement at issue, that ends our first-step inquiry.[30] But sometimes an arbitration agreement's enforceability can reach "strangers to the contract."[31] In these so-called "nonsignatory,"[32] "third party," or "nonpart[y]" cases,[33] we must inquire further.

In making that further inquiry, the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle* is instructive. There, the Supreme Court explained that "background principles of state contract law" govern "who is *bound*" by an arbitration agreement.[34] And those principles can expand the arbitration agreement's enforceability beyond its signatory parties through "traditional" doctrines; doctrines like "assumption, piercing the corporate

---

the extent that a more recent case contradicts an older case, the newer language has no effect." (citing *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999))).

[29] 830 F.3d at 201–02 (first emphasis added, second emphasis original).

[30] *See id.* at 202–03 (explaining that the employee was "deemed" to have accepted the employer's arbitration agreement as a contract modification under Texas law).

[31] *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).

[32] *Crawford Prof'l*, 748 F.3d at 257.

[33] *Arthur Andersen*, 556 U.S. at 631.

[34] *Id.* at 630 (emphasis added).

veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."[35] So in third-party cases we must ask an additional question: Does "a written arbitration provision" exist that "is made enforceable against (or for the benefit of) a third party under state contract law"?[36]

The parties agree that Texas law governs our first-step analysis. Neither Plains nor Cypress contends that Newman actually entered into an arbitration agreement with Plains.[37] What Plains and Cypress *do* contend, though, is that Plains can *enforce* the Newman–Cypress arbitration agreement. Newman adamantly disagrees. We agree with Newman.

## A

Plains contends that it is a third-party beneficiary to the Newman–Cypress Employment Agreement. Newman disagrees. As he points out, the Supreme Court of Texas has explained that Texas law presumes that noncontracting parties are not third-party beneficiaries.[38] To overcome that presumption, "the parties to the contract"—Newman and Cypress—must have "intended to secure a benefit to [a] third party"—Plains—"*and* entered into the contract directly for the third party's benefit."[39]

---

[35] *Id.*

[36] *Id.*; *Crawford Prof'l*, 748 F.3d at 257.

[37] Cypress, for its part, apparently concedes that Newman never entered into an arbitration agreement with Plains. And Newman, naturally, emphatically denies that he ever agreed to an arbitration agreement with Plains.

[38] *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 420 (Tex. 2011).

[39] *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 635 (Tex. 2018) (emphasis added) (quoting *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006)).

No. 21-50253

Still, as Plains accurately notes, we must decide if Newman and Cypress intended to secure a benefit to it by looking at the "entire" Employment Agreement, and "giv[ing] effect to all its provisions."[40] To secure a benefit to Plains, the Employment Agreement must have "clearly and fully spelled [it] out."[41] And the benefit, itself, "must be more than incidental."[42] Only a benefit that would confer Plains the status of a "claimant[]" in the event of breach will do.[43] Whatever Plains's expectations were, they are "irrelevant."[44] Without Newman and Cypress clearly and fully spelling it out in the contract, whatever benefit Plains hoped it had "must be denied."[45] And where third-party-beneficiary status is "doubt[ful]," it too must be denied.[46] Applying that standard, Plains cannot overcome the presumption against third-party-beneficiary status for two reasons.[47]

---

[40] *City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011).

[41] *Jody James*, 547 S.W.3d at 635.

[42] *Id.*

[43] *See Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975) ("In our opinion, it appears that the City intended to protect the materialmen and subcontractors by its contractual requirement for an Article 5160 payment bond, but it does not 'clearly appear,' as required by Citizens that the City intended to make them claimants against the City on the contract.").

[44] *Jody James*, 547 S.W.3d at 635.

[45] *Id.*

[46] *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

[47] A third reason exists, too. In its Reply brief, Plains argues for the first time that TIR's separate agreement to indemnify it clearly and fully spelled out a benefit under the Newman–Cypress Employment agreement. But it did not raise that argument before the district court in its motion to compel arbitration. And it did not raise that argument before us in its opening brief. But "we have consistently held [that] 'arguments not raised before the district court are waived and cannot be raised for the first time on appeal.'" *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*,

No. 21-50253

*First*, Newman's incorporated-by-reference Pay Letter did not clearly and fully spell out that Plains could take legal action if either Newman or Cypress breached its terms. To the extent that it named Plains at all, the Pay Letter merely list "Plains-Pipeline" as the "Client."[48] Further, the Pay Letter expressly provided that Cypress—not Plains—controlled Newman's pay. Cypress only "based" Newman's pay on his job "classification" and a *separate* "agreement" that it had with Plains. And, as the Employment Agreement makes plain, Newman's pay could "be changed over time *at the discretion* of [Cypress] whether based on changes in job classification or assignment, changes in [Cypress's] agreement with [Plains], *or otherwise*." Cypress agrees that it alone controlled Newman's pay: "Plains paid Cypress an all-inclusive rate to compensate it for the services it provided; from that amount, Cypress, in its sole discretion, determined how much to pay each of its inspectors." All that is to say, if Cypress unilaterally decided to pay Newman more or less, or if Newman, for example, failed to submit "a mileage log" for reimbursement purposes, Plains had no clearly and fully spelled out right to sue under the Pay Letter.

*Second*, the Employment Agreement itself did not clearly and fully spell out that Plains could take legal action if Newman decided to breach its other terms. For instance, Newman agreed to protect both Cypress's and Plains's "confidential business and trade secrets." But if he breached that agreement, the Employment Agreement did not expressly provide Plains the

---

480 F.3d 383, 387 (5th Cir. 2007)). Further, we "do[] not entertain arguments raised for the first time in a reply brief [unless] a new issue is raised in the appellee's brief and the appellant responds in his reply brief." *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009). Because Newman did not raise a *new issue* in his brief warranting this new argument, we need not address this argument by Plains.

[48] Smith's Pay Letter similarly named "Plains All American" as the "Client" without further express reference to Plains.

right to sue Newman. Rather, it provided that such a breach would "irreparably injure" Cypress by causing it to "violate the confidentiality provisions [it had] with its customers." And if Newman so injured Cypress, then the Employment Agreement expressly contemplated only Cypress, as the "Employer," suing Newman in court on "claims for injunctive relief."[49] Further, Newman and Cypress both agreed that, although Newman's "employment [was] based on a specific project to be performed for [Plains]," Newman's employment was "at will."[50] Newman could have walked off the job "at any time for any reason," and Cypress could likewise have fired him. Nowhere did Newman's Employment Agreement give Plains a clear and fully spelled out say in any of that.

For those two reasons, Plains was not a third-party beneficiary under Newman's Employment Agreement with Cypress. Plains's contrary arguments are unpersuasive. Although it reads Newman's Employment Agreement like we do,[51] Plains draws a different conclusion from that reading. It concludes that its express designation as the specific project client in Newman's Employment agreement entitled it to third-party-beneficiary status. Not so.

Plains hangs its hat here on the Texas Supreme Court's decision in *City of Houston v. Williams*.[52] In that case, firefighters sued their city for not

---

[49] Smith's Employment Agreement similarly provides that Plains as his "Employer" could "restrain" him from releasing "any trade secrets or confidential business information."

[50] Smith's Employment Agreement is substantively identical, providing for an "at will" relationship that was terminable "with or without cause and for any reason."

[51] Plains also reads Newman's Employment Agreement to "explicitly state[] that [his] employment [was] 'based on a specific project' and 'for a designated customer,'" with the Pay Letter "identifying Plains as that very customer."

[52] 353 S.W.3d 128 (Tex. 2011).

properly paying "lump sums due upon termination of their employment."[53] In support, the firefighters pointed to two contracts that their union had negotiated with the city on their behalf.[54] These contracts expressly stated that one purpose was "to provide certain wages, hours, and conditions of employment" to the firefighters as the city's "employee[s]."[55] Though the firefighters themselves did not sign these agreements, the Supreme Court of Texas held that the firefighters had standing to sue the city on them as third-party beneficiaries.[56] Said the Court, the contracts "reflect[ed] an intent to benefit the firefighters" because the union had a duty to represent and seek benefits for them; the contracts' express purpose was to benefit them; and the contracts limited pay-related benefits to them, as opposed to offering pay benefits "to the world at large."[57]

This case is not *City of Houston*. The *City of Houston* firefighters sued to enforce specific "guarantees of compensation . . . not promised to the [c]ity or to the [u]nion," but to *them*.[58] In other words, a right was clearly and fully spelled out for them in the contract. True, the Pay Letter did identify Plains as the designated customer that Cypress hired Newman to do work for. But as we already explained, Newman could have literally walked off the job at any point. If he had, his Employment Agreement with Cypress did not provide Plains with any clearly and fully spelled out right to recourse. Newman's Employment Agreement, at most, conferred a benefit to Cypress

---

[53] *Id.* at 131.

[54] *Id.*

[55] *Id.* at 146.

[56] *Id.*

[57] *Id.*

[58] *Id.*

No. 21-50253

that was incidental and borderline doubtful. That is not enough to confer third-party-beneficiary status in Texas.[59]

## B

Plains and Cypress also contend that intertwined-claims estoppel allows Plains to enforce the Newman–Cypress arbitration agreement. Newman denies that intertwined-claims estoppel even exists under Texas law. He argues that the Texas Supreme Court has repeatedly refused to recognize intertwined-claims estoppel.

Newman does have some support. In *In re Merrill Lynch Trust Co. FSB*, the Supreme Court of Texas acknowledged that federal courts had applied the theory to allow nonsignatories to enforce arbitration agreements.[60] But it did not decide if the theory existed in Texas.[61] Over a decade later, the Texas Supreme Court in *Jody James Farms, JV v. Altman Group, Inc.* again acknowledged its existence, as well as our *Erie*-guess that intertwined-claims estoppel exists in Texas.[62] Yet the *Jody James* Court again declined to decide the question since, even if intertwined-claims estoppel did exist in Texas, the facts did not support its application.[63]

Still, our hands are tied. We already made our *Erie*-guess,[64] and the Texas Supreme Court has not changed Texas law since. So, the rule of

---

[59] *Tawes*, 340 S.W.3d at 425.

[60] 235 S.W.3d 185, 193–94 (Tex. 2007).

[61] *Cf. id.*; *see also Jody James*, 547 S.W.3d at 639 ("In *In re Merrill Lynch Trust Co.*, we acknowledged the existence of this theory without deciding its validity in Texas.").

[62] 547 S.W.3d at 639 (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016)).

[63] *Id.*

[64] *Hays*, 838 F.3d at 612.

No. 21-50253

orderliness binds us to assume that intertwined-claims estoppel exists in Texas.[65] Under our *Erie*-guess, intertwined-claims estoppel applies when: (1) "a nonsignatory has a 'close relationship' with one of the signatories," and (2) "the claims are 'intimately founded in and intertwined with the underlying contract obligations.'"[66] But that only gets Plains and Cypress so far. That is because Plains and Cypress do not have a close relationship. Therefore, Newman is ultimately right that intertwined-claims estoppel does not apply.

Newman denies that Plains has a close relationship with Cypress.[67] He points out that, under Texas law, a *close relationship* is a term of art, generally requiring formal corporate affiliation.[68] The relationship between a typical insurance agency and an "independent broker or salesman," for instance, is not close enough in Texas.[69] The relationship "must be closer than merely independent participants in a business transaction."[70] The test is one of "consent, not coercion."[71] Would a reasonable signatory to the arbitration agreement anticipate being forced to arbitrate claims against the

---

[65] *Jacobs v. Nat'l Drug Intelligence Center*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law . . . .").

[66] *Hays*, 838 F.3d at 612 (quoting *Cotton Com. USA, Inc. v. Clear Creek Indep. Sch. Dist.*, 387 S.W.3d 99, 105 (Tex. Ct. App. 2012)); *Jody James*, 547 S.W.3d at 639.

[67] Neither Cypress nor Plains contends that Plains has a close relationship with Newman.

[68] *See Jody James*, 547 S.W.3d at 640 ("The Second Circuit's [intertwined-claims-estoppel] cases compelling arbitration typically involve some corporate affiliation between a signatory and non-signatory, not just a working relationship.").

[69] *Id.*

[70] *Id.*

[71] *Id.* at 639.

nonsignatory?[72] On the other hand, we have said that when plaintiffs treat multiple defendants "as a single unit" in their pleadings, "raising virtually indistinguishable factual allegations" against them, then that cuts in favor of a close relationship.[73]

Applying that standard here, Cypress and Plains do not have a close relationship. Cypress and Plains admit they are independent business entities. And Newman has not treated Cypress and Plains as a "single unit" in his pleading. In fact, Newman has not even sued Cypress; it intervened. Still, Cypress and Plains contend that they have a close relationship under three different theories. None persuade.

*First*, Plains theorizes that two facts created a close relationship with Cypress: "Cypress utilized [Newman] specifically to provide services to Plains" and Newman has "alleged Plains is liable for [his] FLSA claims based on [the] allegation that Plains is [his] joint employer, along with Cypress." Plains relies on a Second Circuit case—*Ragone v. Atlantic Video at Manhattan Center*—in support.[74] Because intertwined-claims estoppel apparently differs between the Second Circuit and Texas law, though, *Ragone* does not change our analysis.

In *Ragone*, a makeup artist worked as an employee for a digital broadcaster and signed an arbitration agreement with it.[75] The digital broadcaster provided the makeup artist to one of its clients, a major sports

---

[72] *See id.* at 640 ("A reasonable consumer would not anticipate being forced to litigate complains against an independent insurance agent in the same manner they agreed to litigate disputes with the insurer.").

[73] *Hays*, 838 F.3d at 612–613.

[74] 595 F.3d 115 (2d Cir. 2010).

[75] *Id.* at 118.

network. There, the makeup artist allegedly experienced "pervasive and continuous sexual harassment."[76] The sports network never signed the arbitration agreement. Nor did any document that the makeup artist signed ever mention the sports network.[77] Yet the Second Circuit held that the sports network could compel arbitration, under intertwined-claims estoppel, when the makeup artist sued it.[78] Said the Second Circuit, the digital broadcaster and the sports network had a close relationship because the makeup artist "understood [the sports network] to be, to a considerable extent, her co-employer."[79]

Whatever *Ragone*'s persuasive force, though, it does not control here. Our inquiry is governed by *Texas* law. It is unclear from *Ragone* what law the Second Circuit was applying. Some language in the opinion suggests that it was applying New York law.[80] But when it came to intertwined-claims estoppel, the Second Circuit cited intra-circuit caselaw without reference to what New York law requires.[81] So to the extent the Second Circuit relied on either New York law or federal common law, we cannot follow its lead. The Supreme Court in *Arthur Andersen* was clear: *State law* governs whether an arbitration agreement is enforceable between parties, and the parties agree

---

[76] *Id.* at 119.

[77] *Id.*

[78] *Id.* at 127.

[79] *Id.*

[80] *See id.* at 121 (discussing New York's unconscionability doctrine).

[81] *See id.* at 126–27 (citing *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).

that Texas law governs.[82] And when it comes to that state law, the Second Circuit is apparently at odds with Texas.

Specifically, Texas law weighs the nonsignatory's status as an independent business against finding a close relationship heavier than the Second Circuit does. In *Merrill Lynch*, which we discuss more below, the Texas Supreme Court explicitly rejected applying equitable estoppel to allow two nonsignatory *subsidiaries* to enforce an arbitration agreement their corporate parent had with the plaintiff.[83] And it did so even after it discussed intertwined-claims estoppel as a theory that federal courts had applied before.[84] That stands in contrast to *Ragone*, where the Second Circuit found a close relationship between two non-subsidiary, independent businesses. And here, no party contends that Plains and Cypress were anything but completely independent businesses, let alone subsidiaries.

*Second*, Cypress theorizes that it has a close relationship with Plains based on Newman's joint-employment theory alone. In support, it relies on our unpublished decision in *Trujillo v. Volt Management Corp.*[85] Yet even if *Trujillo* were binding,[86] it remains distinguishable.

In *Trujillo*, a human-resources professional worked as an employee for a staffing company. The staffing company leased various employees to a client, with the human-resources professional providing on-site support for

---

[82] 556 U.S. at 630–31.

[83] *See* 235 S.W.3d at 191–95.

[84] *Id.* at 193–94.

[85] 846 F. App'x 233 (5th Cir. 2021) (per curiam).

[86] *See United States v. Weatherton*, 567 F.3d 149, 153 n.2 (5th Cir. 2009) ("[A]n unpublished opinion issued after January 1, 1996 is not controlling precedent, [though] it may be considered as persuasive authority." (citation omitted)).

their human-resources needs. As part of her employment with the staffing company, the human-resources professional signed an arbitration agreement. She did not, however, ever sign one with the client company. When her request for a disability accommodation was denied, she sued the client company.[87] We affirmed the district court's conclusion that the client company could compel arbitration.[88] In so doing, we necessarily held that a close relationship existed between the client company and either or both the human-resources professional and staffing company.[89]

Even so, a critical fact was present in *Trujillo* that is missing here. In *Trujillo*, the district court *found* that "the parties, contracts, and controversies" were "tight[ly] related."[90] The district court did not do so here. Rather, it found that Plains "does not have any of those relationships with the signatory (Cypress)" that other courts have found to create a close relationship. As Newman points out, we must review the district court's non-application of intertwined-claims estoppel for abuse of discretion.[91] Cypress points to no other facts that support the district court abused its discretion in making this finding. Therefore, Plains and Cypress's second theory is also unpersuasive.

*Third*, Plains theorizes that it has a close relationship with Cypress because TIR—a Cypress subsidiary—"contractually agreed to indemnify Plains in connection with [Newman's] FLSA claims." As an initial matter,

---

[87] *Trujillo*, 846 F. App'x at 234–35.

[88] *Id.* at 237.

[89] *See id.*

[90] *Id.*

[91] *See Grigson*, 210 F.3d at 528 ("[W]hether to utilize equitable estoppel in this fashion is within the district court's discretion; we review to determine only whether it has been abused.").

Newman contends that Plains waived this argument by not making it below. It is true that we "will not consider arguments first raised on appeal."[92] However, Plains's motion to compel arbitration plainly argued that one of the reasons it was entitled to intertwined-claims estoppel was because of the TIR–Plains indemnity agreement. We can, therefore, review this argument.

That does not mean, though, that we are persuaded by it. The indemnity agreement in this case does not create a close relationship between Cypress and Plains for the purposes of estopping *Newman*. Again, a close relationship is about "consent, not coercion" in Texas.[93] Would a reasonable signatory to the arbitration agreement anticipate being forced to arbitrate claims against the nonsignatory?[94] The answer here is *no*. Between Newman and his six other co-plaintiffs, all seven signed their Employment Agreements directly with Cypress—not TIR. The *only* one of them that TIR even paid directly was Michael Crain. Cypress admits that it paid the rest. A reasonable signatory to an arbitration agreement would not foresee that a corporate subsidiary—with which he has no affiliation—can unilaterally change his arbitration rights merely by agreeing to indemnify a client. And even for Crain, who TIR directly paid, Plains cites no caselaw supporting that an employer can unilaterally expand the scope of its employee's consent to arbitrate—especially in an agreement it is not even a party to—by agreeing to indemnify a third-party client. Therefore, Plains and Cypress's third theory is unpersuasive as well.

---

[92] *E.g.*, *Estate of Duncan v. Comm'r of Internal Revenue*, 890 F.3d 192, 202 (5th Cir. 2018) (citation omitted).

[93] *Jody James*, 547 S.W.3d at 639.

[94] *See id.* at 640 ("A reasonable consumer would not anticipate being forced to litigate complains against an independent insurance agent in the same manner they agreed to litigate disputes with the insurer.").

C

Finally, Cypress contends that artful-pleading estoppel applies to allow Plains to enforce the Newman–Cypress arbitration agreement. Its best case is the Texas Supreme Court's decision in *Merrill Lynch*.[95] Newman disagrees, contending that decision supports him. Artful-pleading estoppel in Texas requires two things: (1) "naming individual agents of the party to the arbitration clause and suing them in their individual capacity"[96]; and (2) bringing a suit that in "substance" is against those agents' principal.[97] Neither element is present here. Newman has not named any individual agent of Cypress's in his complaint as a defendant. Rather, he has named a separate business: Plains. Nor is his suit in substance against Plains as a principal. He is suing Plains directly for its alleged FLSA violations. Therefore, we agree with Newman: Artful-pleading estoppel does not apply.

The Texas Supreme Court's application of this rule in *Merrill Lynch* only bolsters our analysis. There the Court explicitly distinguished between suing a principal's employees and suing its subsidiaries.[98] When it came to the former, the principal's arbitration agreement would cover the employees so long as the suit's substance covered actions within the course and scope of their employment.[99] But when it came to the latter, "a contract with one corporation—including a contract to arbitrate disputes—is generally not a

---

[95] 235 S.W.3d 185 (Tex. 2007).

[96] *Id.* at 188 (quoting *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1318 (11th Cir. 2002) (internal quotations omitted)).

[97] *Id.* at 189.

[98] *See id.* at 194 ("As discussed above with reference to the employees, allowing litigation to proceed that is in substance against a signatory though in form against a nonsignatory would allow indirectly what cannot be done directly.").

[99] *Id.* at 190.

contract with any other corporate affiliates."[100] Although one separate business can, in theory, act as another's agent,[101] merely acting as a corporate subsidiary is not enough to invoke artful-pleading estoppel.[102] Since acting as a corporate *subsidiary* is not enough to equitably invoke artful-pleading estoppel in Texas, then it is beyond doubtful that the Texas Supreme Court would allow a completely separate business do it.

## V

Arbitration under the FAA is "a matter of contract."[103] But judges continue to play an important role. Where, as here, the parties dispute whether an enforceable arbitration agreement exists between them, it takes a court to decide. Applying Texas contract law and equitable doctrines to this case compels one conclusion: Plains cannot enforce the Newman–Cypress arbitration agreement. Accordingly, we AFFIRM the district court.

---

[100] *Id.* at 191 (citations omitted).

[101] *See id.* at 189 ("The commission on this insurance transaction was paid directly to Merrill Lynch, not Medina; if the latter was acting as an agent for ML Life or ML Trust, then so was the former.").

[102] *Cf. id.* at 195 (holding that the subsidiaries could not enforce their parent corporation's arbitration agreement with the plaintiff).

[103] *Henry Schein*, 139 S. Ct. at 529 (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).