**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1480

LASTEPHEN ROGERS, Individually and for others similarly situated,

Plaintiff - Appellant,

v.

TUG HILL OPERATING, LLC; RUSCO OPERATING, LLC,

Defendants - Appellees.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:21-cv-00199-JPB)

Argued:  May 3, 2023                    Decided:  August 7, 2023

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

Reversed and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:**  Richard Jennings Burch, BRUCKNER BURCH PLLC, Houston, Texas, for Appellant.  John Barrick Bollman, MCDERMOTT WILL & EMERY, LLP, Chicago, Illinois; Christian Charles Antkowiak, BUCHANAN INGERSOLL & ROONEY PC, Pittsburgh, Pennsylvania, for Appellees.  **ON BRIEF:**  Anthony J. Majestro, POWELL & MAJESTRO PLLC, Charleston, West Virginia, for Appellant.  Erin J. McLaughlin, BUCHANAN INGERSOLL & ROONEY PC, Pittsburgh, Pennsylvania, for Appellee Tug Hill Operating, LLC.  Rachel B. Cowen, MCDERMOTT WILL & EMERY, LLP, Chicago, Illinois, for Appellee RUSCO Operating, LLC.

NIEMEYER, Circuit Judge:

Lastephen Rogers worked for Tug Hill Operating, LLC, a Texas-based oil and natural gas exploration and production company, for approximately a year and a half at rig sites in West Virginia. He commenced this action against Tug Hill under the Fair Labor Standards Act ("FLSA"), alleging that while Tug Hill formally classified him as an independent contractor, he actually qualified as an employee for purposes of the FLSA based on the degree of control that Tug Hill exercised over his work. He therefore claimed that Tug Hill was required to pay him overtime for those weeks in which he worked more than 40 hours.

Tug Hill filed a motion to dismiss Rogers' action on the ground that Rogers was contractually required to arbitrate his claim against it. The arbitration clause, however, was not in any contract between Rogers and Tug Hill, but rather in a contract between Rogers and RigUp, Inc.,[1] a third-party company that had helped Rogers find the position with Tug Hill. RigUp was in the business of connecting skilled workers with oil and gas companies for a fee.

In addition, RigUp itself filed a motion to intervene in order to seek the action's dismissal in favor of arbitration, despite language in RigUp's contract with Rogers that the arbitration specified in their contract related only to disputes between Rogers and RigUp and that "RigUp will not be a party to disputes . . . between [Rogers] and [Tug Hill]."

---

[1] RigUp, Inc., changed its name to Workrise Technologies, Inc., in 2021. That company, as well as its wholly owned subsidiary, RUSCO Operating, LLC, are referred to herein as "RigUp."

2

The district court granted both motions — allowing RigUp to intervene as a defendant and granting Tug Hill's motion to dismiss Rogers' action and compel arbitration. For the reasons that follow, we reverse both rulings and remand for further proceedings between Rogers and Tug Hill.

I

Rogers had experience working as a foreman at oil rig sites — a position referred to in the oil and gas industry as a "company man" — and he sought to find work with oil and gas companies through RigUp, a company in the business of connecting skilled workers in the industry with companies looking for such workers. To engage RigUp's services, Rogers executed an agreement with RigUp in January 2019 that governed their relationship, entitled "Agreement Between Independent Professional & RigUp For Use Of RigUp Service" (hereafter, "the Agreement"). The Agreement stated that it was "a binding agreement between [Rogers], an independent professional ('you') and RUSCO Operating, LLC, a wholly owned subsidiary of RigUp, Inc. . . . governing [Rogers'] use of the Service (as defined in the RigUp Terms of Service . . .) to provide freelance services to third party companies (each a 'Company' or collectively the 'Companies')."

In signing the Agreement, Rogers represented to RigUp that he was "an independent professional and entrepreneur" who wanted to "be introduced to new clients by RigUp . . . to provide [them] services . . . as an independent professional, and not as an employee." The Agreement explained to Rogers, however, that after RigUp helped match Rogers with a company, he *and that company* would "solely negotiate and determine . . . when and

3

where [he would] perform [p]rojects" and that "[a]ny interactions or disputes between [him] and a Company [would be] solely between [him] and that Company." The Agreement provided further that "RigUp . . . shall have no liability, obligation or responsibility for any interaction between you and any Company." And it expressly stated that "RIGUP WILL NOT BE A PARTY TO DISPUTES OR NEGOTIATIONS OF DISPUTES, BETWEEN YOU AND COMPANIES." The Agreement did provide, however, that Rogers would "indemnify and hold the RigUp Parties and Company harmless from and against all losses, damages, liabilities, . . . actions, [and] judgments . . . arising out of or resulting from" several occurrences, one of which was "a determination by a court or agency that [Rogers] [was] an employee of RigUp or a Company."

The Agreement incorporated RigUp's Terms of Service, and in a paragraph entitled "Dispute Resolution," it also specifically incorporated "Section 24 of the Terms." That section contained an arbitration provision, which stated:

> *In the interest of resolving disputes between you and RigUp in the most expedient and cost effective manner, you and RigUp agree that every dispute arising in connection with these Terms will be resolved by binding arbitration*. . . . This agreement to arbitrate disputes includes all claims arising out of or relating to any aspect of these Terms, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and regardless of whether a claim arises during or after the termination of these Terms. YOU UNDERSTAND AND AGREE THAT, BY ENTERING INTO THESE TERMS, YOU AND RIGUP ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.

(Emphasis added). Section 24 also provided that "[a]ny arbitration *between you and RigUp* will be settled under the Federal Arbitration Act" and "administered by the [American Arbitration Association]" and that "[t]he arbitrator has exclusive authority to resolve any

4

dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement." (Emphasis added).

In January 2019, pursuant to RigUp's matchmaking, Rogers began work as a "company man" at a rig site operated by Tug Hill in West Virginia. Tug Hill classified Rogers as an independent contractor and assigned him to "oversee the rig site and make sure the operations were being performed in accordance with Tug Hill's procedures and instructions." Rogers continued work for Tug Hill through July 2020. According to Rogers, during that year and a half, he worked exclusively for Tug Hill and was paid a daily rate for his work.

In 2021, Rogers commenced this action against Tug Hill, alleging that it had violated the FLSA by failing to pay him any overtime even though he "typically worked more than 80 hours a week." He alleged that he had been "misclassified as an independent contractor by Tug Hill" when he actually performed his work as an employee, based on the degree of control that "Tug Hill exercised . . . over all aspects of his job." He brought the action on behalf of himself and all other similarly situated workers, a class he defined as "[a]ll company men employed by or performing work on behalf of Tug Hill classified as independent contractors and paid a day-rate without overtime during the past three years."

RigUp filed a motion to intervene in the action "as of right" pursuant to Federal Rule of Civil Procedure 24(a)(2), or "by permission" pursuant to Rule 24(b)(1)(B), arguing that it was "in the business of facilitating relationships between oil-and-gas operators and independent contractors who contract to provide freelance services for those operators" and that it had facilitated such a relationship between Tug Hill and Rogers. RigUp argued

5

that intervention was warranted so that it could "represent . . . [its] unique interest in preserving its business model by protecting the independent-contractor status of the workers it serves."  It also alleged that if Rogers' action succeeded, it might have some liability to Tug Hill "as a potential indemnitor" under a contract it had with Tug Hill. RigUp indicated that if its motion to intervene were granted, it would thereafter file a motion to compel arbitration and dismiss or stay the action.

After RigUp filed its motion to intervene, Tug Hill filed a motion to dismiss Rogers' action under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7), contending that "this action should be dismissed and [Rogers] should be compelled to individual arbitration pursuant to the arbitration clause to which he is contractually bound" in his contract with RigUp.  Tug Hill claimed that in the Agreement between Rogers and RigUp, Rogers had "entered into a valid and enforceable" agreement to arbitrate "every dispute arising in connection with these Terms," including "all claims arising out of or relating to any aspect of these Terms," and it maintained that this language covered Rogers' FLSA claim against it.  Tug Hill asserted that the fact that it was "not a signatory to the . . . Agreement" between Rogers and RigUp was "a red herring" because the arbitration clause delegated to the arbitrator the "exclusive authority" to decide questions of arbitrability.  It argued alternatively that it could enforce the arbitration agreement either "as a third-party beneficiary . . . or pursuant to estoppel principles."

In response to RigUp's motion to intervene, Rogers pointed to specific language in his contract with RigUp and argued that "RigUp contractually disclaimed any right to be [a] party to . . . disputes" between workers and operators and that his FLSA suit against

6

Tug Hill was such a dispute. And with respect to Tug Hill's motion to dismiss, Rogers argued (1) that he never "agree[d] to arbitrate his claims against Tug Hill"; (2) that the court, not an arbitrator, "decides existence, validity, and enforceability of arbitration agreements"; and (3) that "Tug Hill cannot compel arbitration under the agreement" based on either third-party beneficiary or estoppel principles.

In a memorandum opinion and order dated April 12, 2022, the district court granted RigUp's motion to intervene, concluding that RigUp was "entitled to intervene in this matter by right" under Rule 24(a) because it had "significantly protectible" interests in the litigation that "could potentially [be] impair[ed]" absent intervention. *Rogers v. Tug Hill Operating, LLC*, 598 F. Supp. 3d 404, 417, 421 (N.D. W. Va. 2022). It identified (1) RigUp's "purely economic interest[]" in its "business model," (2) RigUp's interest in "seeking to enforce [its] arbitration agreement," and (3) RigUp's "potential liability" to Tug Hill under an indemnity provision in the contract between RigUp and Tug Hill. *Id.* at 417–19, 421. The court concluded alternatively that RigUp "would be entitled to permissive intervention" under Rule 24(b). *Id.* at 421.

The court also granted Tug Hill's motion to dismiss and compel arbitration, concluding that the language in Rogers' arbitration agreement with RigUp — providing that "all claims arising out of or relating to any aspect of these Terms [of Service]" were subject to arbitration — was broad enough to cover Rogers' FLSA claim against Tug Hill. The district court further concluded that "the fact [that] defendant Tug Hill [was] not a signatory" to the RigUp Agreement was "of no moment" because any question of arbitrability had to be decided by the arbitrator based on the "delegation clause" in the

7

arbitration agreement. *Rogers*, 598 F. Supp. 3d at 425. Alternatively, the court concluded that Tug Hill was "a third-party beneficiary" that was "permitted to enforce" Rogers' arbitration agreement with RigUp.[2] *Id*. at 427.

From the district court's judgment, Rogers filed this appeal, challenging both of the district court's rulings.

## II

With respect to the district court's dismissal order, Rogers contends that he never agreed to arbitrate anything with Tug Hill and that, as a result, the district court erred in dismissing his action and ordering him to arbitrate with Tug Hill on the ground that his arbitration agreement with RigUp contained a delegation clause authorizing the arbitrator to determine arbitrability. It cannot be, he maintains, that a person like him who has "execut[ed] an arbitration agreement containing a delegation clause" with one party (RigUp) is required to arbitrate whether he must arbitrate with a different party (Tug Hill).

In defending the district court's ruling, Tug Hill contends that Rogers' contract with RigUp contained "a valid arbitration agreement"; that Rogers' FLSA claim against Tug Hill falls within the scope of that arbitration agreement because Rogers agreed to serve "as an independent professional, and not as an employee"; and that the arbitration agreement contained a delegation clause giving the arbitrator "exclusive authority" over arbitrability

---

[2] Because the district court concluded that Tug Hill was a third-party beneficiary, it did not address Tug Hill's alternative argument that it was entitled to enforce the RigUp arbitration agreement under estoppel principles. *See Rogers*, 598 F. Supp. 3d at 427 n.7. Tug Hill has not raised estoppel on appeal, and the issue therefore is not before us.

issues, a category that should be understood to include whether the arbitration agreement is enforceable by a third party. In other words, according to Tug Hill, because Rogers and RigUp delegated "threshold questions to the arbitrator (not a court)," the arbitrator is the one "who must decide whether Rogers must arbitrate his [FLSA] claim[] against Tug Hill."

The parties' positions thus present us with the issue of whether a court or an arbitrator must decide whether Tug Hill can enforce the arbitration clause in the contract between Rogers and RigUp given that the arbitration clause has a delegation provision.

As a foundational principle, the Federal Arbitration Act ("FAA") provides for the enforcement of agreements to arbitrate *when they are created by contract*, and such contracts must be treated like any other contract under applicable state law. Thus, as relevant to the issue presented in this case, the Supreme Court has held that "[b]ecause 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,'" "those who are not parties to a written arbitration agreement" may be eligible for relief under the FAA. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629, 631 (2009) (quoting 21 Richard A. Lord, *Williston on Contracts* § 57:19, at 183 (4th ed. 2001)). What *Arthur Andersen* also makes clear, however, is that it is *a court*, not an arbitrator, that must initially decide whether a nonparty to an arbitration agreement is entitled to enforce it. *See id*. at 630–32. This emanates from the requirements of the FAA.

The FAA grounds arbitration obligations in contract law, as § 2 provides:

9

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2. And consistent with that proposition, § 4 provides that a party "aggrieved" by the failure "of another to arbitrate *under a written agreement* for arbitration may petition" *a federal court* "for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id*. § 4 (emphasis added). That section adds that the court "shall" order arbitration "upon being satisfied that *the making of the agreement* for arbitration or *the failure to comply therewith* is not in issue." *Id.* (emphasis added); *see also id*. § 3 (directing a court to stay a civil action if the claim is "referable to arbitration *under an agreement in writing* for such arbitration" (emphasis added)).

The Supreme Court has recognized explicitly and repeatedly that arbitration obligations are grounded in contract law, including by emphasizing recently that under the FAA, "arbitration agreements [are] as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (cleaned up); *see id.* (explaining that the Court's prior recognition of a federal "policy favoring arbitration" was "merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate" and that "the federal policy is about treating arbitration contracts like all others, not about fostering arbitration" (cleaned up)). Moreover, it is well established that when a challenge to the existence of a contractual obligation is properly raised, "*the court* determines whether a valid arbitration agreement exists" "*before* referring a dispute to an arbitrator." *Henry Schein, Inc. v. Archer & White*

10

*Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (emphasis added); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010) ("If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, *the federal court* must consider the challenge before ordering compliance with that agreement under § 4" (emphasis added)).

Thus, as a general matter, the relevant threshold question that a court must address when being asked to compel arbitration is whether "an arbitration agreement exists *between the parties*." *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001) (emphasis added). But, as noted, there are circumstances in which a nonparty to a contract may nonetheless be entitled to enforce it under standard contract principles, such as "through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen*, 556 U.S. at 631 (cleaned up). Therefore, when an objection is properly raised that the party seeking to enforce an arbitration agreement is not itself a party to that agreement, *the district court* must determine — as a condition precedent to the entry of any § 3 stay or § 4 order compelling arbitration — whether that party is entitled to enforce the arbitration agreement under state contract law. Otherwise, a party with no contractual right to compel arbitration might be permitted to do just that. And nothing in the FAA, or the Supreme Court's jurisprudence interpreting it, allows such a counterintuitive result — a result that would undermine the contractual foundation of the order compelling arbitration.

This principle finds direct support in the Supreme Court's decision in *Arthur Andersen*. In that case, after an accounting firm and others were sued by a group of former clients, those defendants "moved to stay the action, invoking § 3 of the FAA and arguing

11

that the principles of equitable estoppel demanded that [the plaintiffs] arbitrate their claims" based on an arbitration agreement the plaintiffs had entered into with another defendant. *Arthur Andersen*, 556 U.S. at 626–27. While the Sixth Circuit had determined "that those who are not parties to a written arbitration agreement are *categorically* ineligible for relief" under the FAA, the Supreme Court concluded that that holding was incorrect. *Id.* at 629, 631 (emphasis added). It reasoned that while § 2 "creates substantive federal law regarding the enforceability of arbitration agreements, requiring courts to place such agreements upon the same footing as other contracts," neither it nor § 3 "purports to alter background principles of state contract law regarding the scope of agreements" — including the questions of "who is bound by them" and who can enforce them. *Id.* at 630 (cleaned up). Thus, "a litigant who was not a party to the relevant arbitration agreement may invoke § 3" to obtain a stay from the district court "*if the relevant state contract law allows him to enforce the agreement.*" *Id.* at 632 (emphasis added). The Court explained that this was so because "[i]f a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law, *[§3's] terms are fulfilled,*" such that the court would then be "require[d]" to grant a § 3 stay to the third party. *Id.* at 631–32 (emphasis added).

*Arthur Andersen* thus stands for the principle that if state contract law allows a person who was not a party to an arbitration agreement to nonetheless enforce it, then that nonparty is entitled to invoke the FAA's enforcement mechanisms in federal court. *See* 556 U.S. at 631–32; *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020). And the necessary

12

corollary to this principle is that when a nonparty to an arbitration agreement seeks to enforce it with a stay under § 3 or an order to compel arbitration under § 4, it is *the court* that must first determine that "the relevant state contract law allows [that nonparty] to enforce the agreement" so as to assure itself that the FAA's "terms are fulfilled." *Arthur Andersen*, 556 U.S. at 631–32; *see also GE Energy Power*, 140 S. Ct. at 1643 (recognizing that "Chapter 1 of the [FAA] permits *courts* to apply state-law doctrines related to the enforcement of arbitration agreements," including "doctrines that authorize the enforcement of a contract by a nonsignatory" (emphasis added)).

In this case, Tug Hill nonetheless contends that under the terms of the arbitration clause — particularly its delegation provision — the arbitrator, not the court, must be the one to decide whether Tug Hill can enforce the arbitration clause, even though it is in a contract between Rogers and RigUp. It notes that under the language of the delegation provision, "[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability" of the arbitration agreement. In making that argument, however, Tug Hill fails to address the *contractual* source of the arbitrator's authority. When the delegation provision is read in the context of the arbitration clause as a whole, it is plain that Rogers agreed to arbitrate issues — including threshold issues — arising *between him and RigUp*. But he did not enter into any agreement that allows an arbitrator to decide whether a third party like Tug Hill has rights under the arbitration agreement. *See Rent-A-Center*, 561 U.S. at 68–70 (recognizing that a delegation provision is simply "an agreement to arbitrate threshold issues concerning the arbitration agreement"

13

and that "the FAA operates on this additional[,] [antecedent] agreement just as it does on any other").

Of course, the fact that Tug Hill was not itself a party to the arbitration agreement does not categorically mean that Tug Hill is ineligible to obtain relief from the district court under the FAA. *See Arthur Andersen*, 556 U.S. at 629–32. But it does mean that, *as a precondition* to granting Tug Hill the right to enforce any portion of an arbitration clause to which it was not a party, *the district court* was required, when that right was challenged, to determine whether "the relevant state contract law allow[ed] [Tug Hill] to enforce [that] agreement," so as to ensure that the FAA's terms "are fulfilled." *Id*. at 631–32; *cf. New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 536–38 (2019) (holding that even "[w]hen a contract delegates questions of arbitrability to an arbitrator," "a court should decide for itself whether [the FAA's] 'contracts of employment' exclusion applies before ordering arbitration" because "to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first" resolve that "necessarily antecedent statutory inquiry").

Accordingly, we conclude that the district court erred in ruling that it could use its statutory powers under the FAA to grant Tug Hill's motion to compel arbitration without first resolving whether, as a matter of state contract law, Tug Hill was authorized to enforce the arbitration agreement between RigUp and Rogers. *Accord Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398–99 (5th Cir. 2022) (holding that it is for the court, not an arbitrator, to decide whether a litigant can enforce an arbitration agreement between two other parties); *see also CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723–

14

24 (7th Cir. 2022) (affirming the district court's application of "the rule that a judge must decide whether the parties have agreed to arbitrate" and concluding that an exception to the "dominant rule" that generally "C [cannot] claim rights under a contract that has only A and B as parties" was not applicable). *But see, e.g.*, *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355–56 (6th Cir. 2022) (holding that the question of whether a third party could enforce a delegation provision in an arbitration clause was for the arbitrator, not the court).

III

While the district court simply allowed Tug Hill to enforce the RigUp-Rogers arbitration agreement without determining Tug Hill's contractual authority to do so, it also concluded alternatively that it would apply West Virginia law and find that the RigUp Agreement "demonstrates an intent to make . . . Tug Hill a third-party beneficiary" by "provid[ing] specific — and significant — benefits to . . . Tug Hill." *Rogers*, 598 F. Supp. 3d at 427. Based on this, the court concluded that "Tug Hill should be permitted to enforce [Rogers'] agreement" to arbitrate "every dispute" arising in connection with the Agreement. *Id*. The court also explained that while it had found that West Virginia law governed, it would reach the same result under Texas law. *Id*. at 427 n.5.

While the parties dispute whether West Virginia or Texas law applies, they agree that with respect to the third-party beneficiary issue, the law in the two states does not materially differ. Consequently, we need not decide which law applies in resolving whether Tug Hill may enforce the RigUp arbitration agreement as a third-party beneficiary.

15

Both Texas and West Virginia apply a presumption against finding that a contract confers third-party beneficiary status. *See First Bank v. Brumitt*, 519 S.W.3d 95, 103 (Tex. 2017) ("We must begin with the presumption that the parties contracted solely for themselves, and only a clear expression of the intent to create a third-party beneficiary can overcome that presumption" (cleaned up)); *Eastern Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 278 (W. Va. 2001) ("In the absence of a provision in a contract specifically stating that such contract shall inure to the benefit of a third person, there is a presumption that the contracting parties did not so intend and in order to overcome such presumption the implication from the contract as a whole and the surrounding circumstances must be so strong as to be tantamount to an express declaration" (quoting Syl. pt. 2, *Ison v. Daniel Crisp Corp.*, 122 S.E.2d 553, 553–54 (W. Va. 1961))). And both Texas and West Virginia law similarly include a requirement that the parties must have intended to secure a benefit to a third party. Under West Virginia law, "[a] third-party beneficiary may enforce a contract only if it is made for its *sole benefit*." *Donna S. v. Travis S.*, 874 S.E.2d 746, 755 (W. Va. 2022) (emphasis added) (citing W. Va. Code § 55-8-12). And Texas law provides that "a person seeking to establish third-party-beneficiary status must demonstrate" not only "that the contracting parties intended to secure a benefit to that third party" but also that they "entered into the contract *directly for the third party's benefit*." *First Bank*, 519 S.W.3d at 102 (emphasis added) (cleaned up).

In this case, the Agreement between Rogers and RigUp contains no provision stating specifically that it was entered into *for the sole benefit* of Tug Hill or *directly* for its benefit. Indeed, the language of the Agreement indicates to the contrary. The Agreement provides

16

that its purpose was to govern *only* the legal relationship *between RigUp and Rogers*. While RigUp's matchmaking service enabled Rogers to connect with Tug Hill, the Agreement anticipated that Rogers and Tug Hill would have to separately "negotiate and determine . . . when and where [Rogers would] perform Projects" for Tug Hill, as well as how much Tug Hill would pay Rogers.  Moreover, the Agreement expressly disclaimed any "responsibility for any interaction between [Rogers] and [Tug Hill]" and distanced itself from any arrangement that Rogers might reach with Tug Hill by providing that "[a]ny interactions or disputes between [Rogers] and [Tug Hill] are solely between [Rogers] and [Tug Hill]."  The Agreement also provided that "RigUp is not responsible or liable for the actions or inactions of [Tug Hill] or other third party in relation to Projects as completed by [Rogers]" and that RigUp "will not be a party to disputes or negotiations of disputes, between [Rogers] and [Tug Hill]."

Finally, and perhaps most tellingly, the arbitration clause itself limits its applicability to disputes *between Rogers and RigUp*.  It provides that "[i]n the interest of resolving disputes between [Rogers] and RigUp in the most expedient and cost effective manner, [Rogers] and RigUp agree" to arbitrate disputes, such that "by entering into these terms, *[Rogers] and RigUp* are each waiving the right to a trial by jury." (Emphasis added). The remaining provisions of the arbitration clause similarly contemplate arbitration only between Rogers and RigUp, not between Rogers and any company for whom Rogers performed projects (here, Tug Hill).  Thus, it provided that "[a]ny arbitration *between [Rogers] and RigUp* will be settled under the Federal Arbitration Act," and it included

17

additional details of how arbitration would proceed between "[Rogers] and RigUp." (Emphasis added).

These numerous provisions in the Agreement preclude any conclusion that the Agreement was entered into *solely or directly for the benefit of Tug Hill*, such that Tug Hill could enforce it as a third-party beneficiary. Accordingly, the district court erred in granting Tug Hill's motion to dismiss and compelling Rogers, under the arbitration agreement between him and RigUp, to proceed to arbitration with respect to his FLSA claim against Tug Hill.

IV

Rogers also contends that the district court abused its discretion in granting RigUp's motion to intervene under Federal Rule of Civil Procedure 24. We agree.

Rogers' suit against Tug Hill is a claim for overtime wages under the FLSA, which brings to issue the terms and conditions under which Rogers *actually* worked for Tug Hill over a period of some 18 months. While RigUp acted as matchmaker in initially connecting Rogers with Tug Hill, their subsequent arrangement, as stated in the Agreement, was independent of Rogers' contract with RigUp. Indeed, the Rogers-RigUp Agreement went to great lengths to distance RigUp's matchmaking service from the work that Rogers would thereafter perform for the company with which he was matched. And in its motion to intervene, RigUp only claimed that its interest in Rogers' suit against Tug Hill was to protect its own business model and to avoid or mitigate liability to Tug Hill under the agreement governing their business relationship. We might well question, simply on that

18

basis, whether RigUp has articulated a sufficient interest under Rule 24 to justify intervention in Rogers' FLSA action.

Instead, however, we conclude that the district court abused its discretion in allowing RigUp's intervention because it failed to recognize, as Rogers had specifically argued, that "RigUp contractually disclaimed any right to be [a] party to . . . disputes" like this one.

In several specific provisions of the Agreement, Rogers and RigUp agreed that RigUp would not be a party to disputes between Rogers and the oil and gas operator for whom he would work, which ended up being Tug Hill. For example, the Agreement stated broadly that "[a]ny interactions or disputes between [Rogers] and [Tug Hill] [were] solely between [Rogers] and [Tug Hill]" and that "RigUp and its licensors shall have no liability, obligation or responsibility for any interaction between [Rogers] and [Tug Hill]." Elsewhere, the Agreement stated that "RigUp [was] not responsible or liable for the actions or inactions of [Tug Hill]," and Rogers agreed to "waive and release RigUp from any and all liability, claims or damages arising from or in any way related to projects or companies." The Agreement then provided, "RIGUP WILL NOT BE A PARTY TO DISPUTES OR NEGOTIATIONS OF DISPUTES, BETWEEN [ROGERS] AND COMPANIES."

RigUp thus expressly agreed with Rogers that it would "not be a party to disputes" between Rogers and any third-party company, such as Tug Hill. By doing so, RigUp waived whatever right it might otherwise have had to be a party to Rogers' action against Tug Hill, thus precluding its intervention under Rule 24. Indeed, one of the requirements for intervention as of right under Rule 24(a)(2) is that the would-be intervenor be "situated

19

[such] that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P. 24(a)(2). Because RigUp's agreement with Rogers expressly disclaimed any interest in any litigation Rogers might have with a company in Tug Hill's position, making clear that RigUp would *not* be involved in such disputes as a third party, RigUp cannot now opportunistically claim that intervention is necessary to protect its interest. Similarly, before permitting a party to intervene under Rule 24(b), a district court is required to "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ. P. 24(b)(3), an inquiry that here required consideration of the Agreement's provision that Rogers would litigate any dispute he had with a company like Tug Hill without RigUp's being "a party to [that] dispute[]."

The district court accordingly abused its discretion by allowing RigUp's intervention notwithstanding the Agreement's plain terms.

*          *          *

The judgment of the district court is reversed, and the case is remanded for further proceedings between Rogers and Tug Hill, consistent with this opinion.

REVERSED AND REMANDED