**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-2020

MICHAEL A. NAIMOLI, JR.; MORGAN FRENCH; ANDREW COLLINS; MARISSA SANTARLASCI,

Plaintiffs - Appellees,

v.

PRO-FOOTBALL, INC., now known as Pro-Football LLC, a/k/a Washington Commanders Football Team, f/k/a Washington Football Team, f/k/a Washington Redskins Football Team; WFI STADIUM, INC., now known as WFI Stadium LLC, f/k/a JKC Stadium, Inc.; CONTEMPORARY SERVICES CORPORATION, (CSC),

Defendants - Appellants,

and

COMPANY DOES, Maintenance Subcontractors at FedEx Field,

Defendant.

-------------------------------------------

ATLANTIC LEGAL FOUNDATION,

Amicus Supporting Appellants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge.  (8:22-cv-02276-TDC)

Argued:  September 24, 2024                    Decided:  October 29, 2024

Before NIEMEYER, GREGORY, and HEYTENS, Circuit Judges.

---

Vacated, reversed in part, and remanded in part by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Heytens joined.

---

**ARGUED:**  Shay Dvoretzky, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Appellants.  Robert D. Sokolove, WEIR GREENBLATT PIERCE LLP, Philadelphia, Pennsylvania, for Appellees.  **ON BRIEF:**  Joe G. Hollingsworth, Grant W. Hollingsworth, Brett S. Covington, HOLLINGSWORTH LLP, Washington, D.C.; Paul Finamore, Halle P. Gray, PESSIN KATZ LAW, P.A., Columbia, Maryland, for Appellants Pro-Football, Inc. and WFI Stadium Inc.  M. Patrick Gallagher, MARTELL, DONNELLY, GRIMALDI & GALLAGHER, P.A., Hunt Valley, Maryland, for Appellant Contemporary Services Corporation.  Jennifer Hiller Nimeroff, WEIR GREENBLATT PIERCE LLP, Philadelphia, Pennsylvania, for Appellees.  Lawrence S. Ebner, ATLANTIC LEGAL FOUNDATION, Washington, D.C., for Amicus Curiae.

NIEMEYER, Circuit Judge:

While attending a professional football game between the Philadelphia Eagles and the Washington Football Team at FedExField in the Maryland suburbs of Washington, D.C., the four plaintiffs were injured when a railing collapsed. They commenced this action for negligence against the owner of the football team, the owner of the stadium, the company that provided security services at the stadium, and unidentified maintenance persons. The defendants filed a motion to compel arbitration based on an arbitration clause contained in the terms and conditions governing the purchase and use of the tickets. The tickets were purchased online by a friend and relative of the plaintiffs, Brandon Gordon (who is not a party), and Gordon displayed the electronic tickets using his iPhone to provide entry into the game for him, the plaintiffs, and four others.

The district court denied the motion to compel arbitration finding (1) that factual disputes existed as to whether the arbitration clause was indeed agreed to by Gordon, but (2) that, even if he did enter into such a contract, the defendants did not demonstrate that Gordon was an agent of the plaintiffs who could bind them to the arbitration clause.

As to whether the plaintiffs were bound by any contract that Gordon may have entered into, we reverse. And as to whether Gordon actually had a contract with the defendants, we remand to permit the district court to conduct such proceedings as necessary to resolve the factual disputes and determine the legal issue.

3

I

Through a website called "TickPick," Brandon Gordon purchased nine tickets on December 27, 2021, for the football game scheduled for January 2, 2022, between the Philadelphia Eagles and the Washington Football Team at FedExField in Landover, Maryland. He purchased one ticket for himself, one for his cousin, and seven for friends and stored all of them on his iPhone. On the day of the game, the group of nine drove from New Jersey to FedExField, and Gordon presented the nine tickets at the gate with his iPhone, which allowed the group to enter FedExField to watch the game. After the Eagles won 20 to 16, the group wanted to congratulate the Eagles players, and employees of Contemporary Services Corporation, the company providing security at the stadium, directed them to a location near the tunnel where the Eagles players would be departing from the field to their locker room. As the plaintiffs — Michael Naimoli, Jr., Morgan French, Andrew Collins, and Marissa Santarlasci — leaned against the railing to give congratulatory "high-fives" to the players, the railing collapsed, causing them to fall 5 to 10 feet to the concrete floor of the tunnel and sustain personal injury.

The four commenced this action against Pro-Football, Inc., WFI Stadium Inc.,[*] and Contemporary Services Corporation, as well as other unidentified maintenance persons,

---

[*] Pro-Football, Inc, owns the Washington Commanders Football Team, formerly the Washington Football Team and before that the Washington Redskins Football Team. WFI Stadium, Inc. is the owner of what was, at the time, referred to as FedExField. Based on the parties' status as of the time of the plaintiffs' claims, we refer to Pro-Football, Inc., as the Washington Football Team and the stadium as FedExField.

4

alleging negligence. They relied on diversity jurisdiction, and each plaintiff claimed damages in excess of $75,000.

Proceeding under § 3 of the Federal Arbitration Act, the defendants filed a "Motion to Compel Arbitration and Dismiss the First Amended Complaint." They contended that the plaintiffs were subject to "mandatory, binding arbitration," as included in the "terms of the ticket licenses that Plaintiffs used to enter and attend" the game. They brought their motion under Federal Rules of Civil Procedure 12(b)(1) (lack of subject-matter jurisdiction), 12(b)(3) (improper venue), and 12(b)(6) (failure to state a claim upon which relief can be granted).

The parties' submissions to the court on the motion included affidavits, exhibits, and memoranda. The plaintiffs maintained (1) that Gordon did not enter into any agreement to arbitrate and (2) that, in any event, the four plaintiffs never possessed the tickets and had no notice of any arbitration agreement so as to be bound by it.

Gordon stated in an affidavit that he purchased the tickets on December 27, 2021, through a website called TickPick and received an email from TickPick confirming the order and stating, "You will receive a followup email when your tickets are ready for Electronic Transfer delivery." He also stated that TickPick then followed up with another email on that same date, stating, "Your tickets are ready to be accepted through the venue's Mobile-To-Mobile Transfer System." The email directed Gordon to click on a box labeled "Transfer Link." When he did, it triggered an email from Ticketmaster, stating that he had received "9 Washington Football Team tickets." The Ticketmaster screen provided a location to click, labeled "Accept Tickets." When Gordon did so, he was prompted to log

5

into his Ticketmaster account, which he did. According to Gordon's affidavit, after he logged into his Ticketmaster account, he "accessed the electronic tickets, which [he] placed in [his] Apple Wallet on [his] iPhone." He claimed that at no time during the ticket-purchase or ticket-access process was he shown the terms and conditions of the Washington Football Team, the company owning FedExField, or Contemporary Services — or, more particularly, a clause requiring arbitration of any claims against those entities. He also claimed that the electronic tickets had no terms or conditions on their face. He concluded accordingly, "I never entered into any contract agreeing to mandatory arbitration."

Michael Naimoli, one of the plaintiffs, submitted an affidavit in which he stated that he never possessed any of the tickets that Gordon had purchased and that he was never "prompted to read terms and conditions which established any sort of contractual relationship with" the defendants. He too concluded, "I never entered into any contract agreeing to mandatory arbitration with any of the Defendants in this lawsuit."

The defendants submitted an affidavit of Matthew Carabajal, the Senior Director of Ticket Operations for the Washington Football Team. Carabajal stated that TickPick is an online secondary marketplace from which to purchase tickets and that a purchaser of tickets from TickPick still had to proceed "through the Washington Football Account Manager (which is powered by Ticketmaster)." According to Carabajal, directly below the space on the Ticketmaster website where Gordon was required to log into his Ticketmaster account with his email address and password and directly above the "Sign In" button that Gordon was required to click to access his account was the following phrase: "By continuing past this page, you agree to the Terms of Use and understand that information will be used as

6

described in both the Ticketmaster Privacy Policy and Washington [Football Team's] Privacy Policy." Carabajal also stated that immediately after Gordon signed into his Ticketmaster account on January 2, 2022 — before the game — he would have been taken to a pop-up window that presented the full text of the Washington Football Team's terms and conditions, which included the arbitration clause. He stated further that those terms and conditions were accompanied by a "button labeled 'Agree,'" which Gordon would have been required to click in order to "access, download, or use electronic tickets for the Football Game." Nonetheless, the screenshot of the pop-up window that Carabajal attached to his affidavit, showing a tab labeled "Washington Commanders Terms & Conditions," also includes a tab labeled "Ticketmaster," which raises the unanswered question whether Gordon was only given *the opportunity* to click on the tab with the Washington Football Team's terms and conditions or *was required* to pass through them to obtain the tickets. Finally, Carabajal stated that the tickets in Gordon's Apple Wallet would have shown a small circle with three dots at the top right corner of the screen, which, when clicked, would have displayed another screen — "the 'back' of the electronic ticket." The "back" of the ticket would have displayed the Washington Football Team's terms and conditions.

Washington Football Team's terms and conditions defined a ticketholder's status as follows:

> Tickets to Washington Football Team ("Team") games and other events held at FedExField are revocable licenses that only grant a one-time entry into the stadium and a seat, or if specified on the ticket, a standing location, for the specified game (the "Event") with no right of re-entry. **The person seeking entry pursuant to such license, and any accompanying minors**

7

**("Holder"), agrees that such license is subject to these terms ("Terms") and by purchase, acceptance and/or use of such license, Holder is deemed to have read the Terms and has agreed to be bound by them.**

And they also included an arbitration clause, written in all caps and partially underlined as follows:

**ANY DISPUTE, CLAIM, OR CAUSE OF ACTION IN ANY WAY RELATED TO THE TICKET OR THE EVENT SHALL BE RESOLVED BY MANDATORY, CONFIDENTIAL, FINAL, AND BINDING ARBITRATION . . . . HOLDER UNDERSTANDS THAT THEY ARE WAIVING THEIR RIGHT TO A COURT OR JURY TRIAL . . . . IF HOLDER DOES NOT CONSENT TO THIS CLAUSE, HOLDER MUST LEAVE OR NOT ENTER THE STADIUM. THIS CLAUSE IS GOVERNED BY THE FEDERAL ARBITRATION ACT.**

The district court found that the plaintiffs were not bound by this arbitration clause. The court concluded first that factual disputes precluded its "finding of a valid contract" between Gordon and the Washington Football Team. *Naimoli v. Pro-Football, Inc.*, 692 F. Supp. 3d 499, 509 (D. Md. 2023). Based on the affidavits of Gordon and Carabajal, the court explained, "this factual dispute is material because if Gordon moved past the pop-up window by viewing and agreeing only to the Ticketmaster Terms of Use, which do not include the arbitration agreement, he would not have agreed to the [Washington Football Team's] Terms & Conditions." *Id*. The court acknowledged that if it credited Gordon's account, "[t]he only way that a user could learn that the [Washington Football Team's] Terms & Conditions were meant to be part of the ticket would be to click on a small circle with three dots in the upper right corner of the ticket, which contained no language directing the user to click on it, stating that it would lead to the 'back' of the ticket, or informing the user that it would lead to the [Washington Football Team's] Terms & Conditions which

8

are part of a contract to which the user was agreeing." *Id*. at 510. The court found that if the defendants had to rely on Gordon's engagement of the three dots, such notice was "entirely insufficient to establish an agreement to a contract." *Id*.

The district court did not undertake to resolve this factual dispute but rather concluded that, "regardless of whether Gordon entered into a contract including the arbitration clause, Defendants [had] not demonstrated that Plaintiffs were bound by the terms of that contract." *Naimoli*, 692 F. Supp. 3d at 510. Acknowledging Maryland's principal-agent law, the court concluded that "Plaintiffs took no actions at the time of the entry of the contract that could be construed as communicating that they had given Gordon the authority to enter into the contract. The only act they undertook was to later enter the stadium using Gordon's tickets." *Id*. at 513. The court continued, "Here, there is no claim or evidence that Plaintiffs were aware of the arbitration clause, or even the [Washington Football Team's] Terms & Conditions more generally, so the Court cannot find that Gordon had apparent authority to enter into a contract containing an arbitration clause, or that Plaintiffs later ratified or assented to the contract and its arbitration clause." *Id*. at 514. Because the defendants had not shown that Gordon had authority to bind the plaintiffs with the arbitration clause, the court denied the defendants' motion to compel the plaintiffs to arbitrate their claims. *Id*. at 516.

From the district court's interlocutory order dated September 14, 2023, the defendants filed this appeal. *See* 9 U.S.C. § 16 (authorizing such interlocutory appeals).

9

II

The district court found that the factual circumstances under which the Washington Football Team's terms and conditions were displayed to Gordon online were disputed and therefore that the basis for the formation of a contract containing the arbitration clause could not be resolved as a matter of law. Rather than conducting proceedings to resolve the factual question, the court denied the defendants' motion to compel arbitration "because regardless of whether Gordon entered into a contract including an arbitration clause," the defendants had "not demonstrated that Plaintiffs were bound by the terms of that contract." *Naimoli*, 692 F. Supp. 3d at 510. Regarding the defendants' claim that Gordon had "apparent authority" under agency law to bind the plaintiffs to the arbitration clause, the court reasoned that the defendants had failed to provide sufficient evidence establishing the critical element that the plaintiffs had "knowledge of [the arbitration clause's] existence." *Id*. at 511. Relying on the Maryland Supreme Court's decision in *Dickerson v. Longoria*, 995 A.2d 721 (Md. 2010), the court asserted that a person seeking to enforce an arbitration clause by apparent authority must show that the principal was "aware of the arbitration agreement" that the person as agent had agreed to. *Naimoli*, 692 F. Supp. 3d at 512 (quoting *Dickerson*, 995 A.2d at 740). Thus, because there was no evidence that plaintiffs were *aware* of any arbitration clause governing their tickets, they did not, the district court reasoned, give Gordon apparent authority under Maryland law to bind them to the arbitration clause. Accordingly, the court concluded that the motion to compel arbitration had to be denied. *Id*. at 516.

10

The issue presented thus reduces to whether Gordon's agreement to arbitrate any claim "related to the ticket or the event" — the existence of which we assume for purposes of this issue — was binding on the plaintiffs under the doctrine of apparent authority.

The Federal Arbitration Act provides that a contract containing an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "As a foundational principle, the Federal Arbitration Act provides for the enforcement of agreements to arbitrate when they are created by contract, and such contracts must be treated like any other contract under applicable state law." *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 285 (4th Cir. 2023) (emphasis omitted), *cert. denied*, 144 S. Ct. 818 (2024). Thus, enforcement of the arbitration clause depends on the enforcement of the contract containing the clause, as determined under state law. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) ("Arbitration agreements are as enforceable as other contracts, but not more so" (cleaned up)); *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 218 (4th Cir. 2024) ("Whether an agreement to arbitrate was formed is a question of ordinary state contract law principles" (cleaned up)). Accordingly, "as a general matter, the relevant threshold question that a court must address when being asked to compel arbitration is whether an arbitration agreement exists *between the parties*." *Rogers*, 76 F.4th at 286 (cleaned up). Put simply, the existence of a contract is a precondition to enforcement of an arbitration clause, and a court must conclude that "the relevant state contract law allows [the plaintiff] to enforce the agreement." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).

11

The relevant state law here is the law of Maryland.  Consequently, whether Gordon entered into a contract with the Washington Football Team to arbitrate and whether the plaintiffs are bound by that contract under the agency principle of apparent authority are determined under Maryland law.

Maryland recognizes that the common law concept of agency, as articulated by the Restatement of Agency, applies in the State.  Thus, it has defined the agency relationship as a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act."  *Williams v. Dimensions Health Corp.*, 279 A.3d 954, 958 (Md. 2022) (ultimately quoting Restatement (Second) of Agency § 1(1)).  Maryland courts have explained that the agency relationship "is created when the principal confers actual authority on the agent," *Dickerson*, 995 A.2d at 735, or when, "[i]n the absence of actual authority, a . . . person has apparent authority to act on behalf of the principal," *id.*; *see also Williams*, 279 A.3d at 958 (quoting Restatement (Third) of Agency § 2.03).  The Restatement of Agency defines "apparent authority" as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03.  Thus, a third party can rely on an agent's purported authority (1) when the third party acts *reasonably* in relying on the agent's authority and (2) when that belief is *traceable* to the principal's manifestations.  This formulation of apparent authority applies even where the agent fails to notify the principal of information.  *See id.* § 5.03 cmt. b; *id.* § 2.03 cmt. d.

12

In this case, the Washington Football Team claims that its reliance on Gordon's apparent authority to act on behalf of the plaintiffs was reasonable, and we agree. When Gordon purchased the nine tickets, he entered into a contract — as we are assuming for this argument — that gave him a limited license to attend the football game. And he agreed that if he were to refuse to consent to the attendant limitations, he would have to "leave or not enter the stadium." When he gave or sold those tickets with their limitations to the plaintiffs, he could give them no more than he had. And it is undisputed that he did transfer the tickets to the plaintiffs as they used them, albeit from his iPhone, to enter the stadium. Even though Gordon was the purchaser of the tickets, it was reasonable for the Washington Football Team to assume that in purchasing nine tickets, Gordon did so both for himself *and for the plaintiffs*, as indicated by the purchase of multiple tickets and the plaintiffs' entry into the stadium by means of those tickets. Indeed, this was consistent with the universal practice of purchasing event tickets both for oneself and for others. Not only was the Washington Football Team's reliance on Gordon's agency reasonable, there is also evidence in the record that the plaintiffs assented to Gordon's agency. The plaintiffs used the tickets on Gordon's iPhone to enter the stadium, thereby manifesting their acceptance that Gordon had acted and was acting on their behalf in purchasing the tickets and presenting them at the game. Thus, not only was the Washington Football Team's reliance on Gordon's agency reasonable, its belief was traceable to the plaintiffs' manifestations — their use of the tickets to enter the stadium. This is all that is required for apparent authority under Maryland law. *See Williams*, 279 A.3d at 958; *Dickerson*, 995 A.2d at 735; *see also* Restatement (Third) of Agency § 2.03.

13

Such apparent authority is reflected not only in the circumstances of this case, but it reflects the reasonable practice of virtually every ticketed event where one person buys tickets for himself or herself as well as for family and friends, often to sit together. *See, e.g.*, *Jackson v. World Wrestling Ent., Inc.*, 95 F.4th 390 (5th Cir. 2024). In *Jackson*, the court held that "[a]n individual who permits a third party to present a ticket for admittance to an event on his behalf is bound by the terms and conditions governing the use of that ticket." *Id*. at 392. The court explained that accepting the arbitration agreement as part of the tickets was well within the agent's authority to give others entry into the stadium. It noted, "Event attendees routinely purchase and present tickets on behalf of family and friends, and in doing so, accept the required terms and conditions." *Id*. at 393. We agree.

We thus conclude that the district court erred in requiring actual awareness as a condition for apparent authority, and therefore we reverse its holding that the plaintiffs were not bound to Gordon's contract with the Washington Football Team, assuming it existed.

The district court, as well as the plaintiffs, relied on *Dickerson* to argue that apparent authority requires actual awareness. *Dickerson*, however, was resolved on a much narrower basis. In *Dickerson*, Carter Bradley gave Carman Dickerson a written power of attorney to act as Bradley's agent for purposes of "health care and financial decisions." 995 A.2d at 735. Reviewing this explicit agency agreement, the Maryland Supreme Court held that "the scope of this consensual relationship did not include the authority to bind Bradley to [an] arbitration agreement" that was included in the agreement that Dickerson signed to place Bradley in a nursing home. *Id*. As the court observed, "Bradley may have

14

conferred on Dickerson the authority to make health care and financial decisions on his behalf, but no more than that. . . .  Quite obviously, the decision to sign an arbitration agreement is not, in and of itself, a health care decision." *Id*. at 736–37.  The court explained also that in light of the express agency agreement and the lack of any other manifestation by Bradley that "Dickerson had the authority to waive [Bradley's] right of access to the courts and right to a trial by jury by signing an arbitration agreement on his behalf," there was no evidence suggesting that Dickerson had apparent authority. *Id*. at 740.  While the court did note that the record showed "no evidence suggesting that Bradley was ever aware of the arbitration agreement," *id*. at 741, it emphasized that Maryland follows standard agency principles.  It explained, "Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act." *Id*. at 735 (cleaned up).  And this is how the Maryland Supreme Court later explained the doctrine more fully in *Williams*. *See* 279 A.2d at 958.  This formulation was derived from the Restatement of Agency, which explicitly notes that apparent authority does not require awareness. *See* Restatement (Third) of Agency § 5.03 cmt. b; *id*. § 2.03 cmt. d.

We believe that *Dickerson*, rather than undermining the well-established principles of apparent authority in Maryland, applied them to the particular facts of the case before the court.  It thus provides little support to the plaintiffs' effort to add additional elements to the well-established requirements for apparent authority.

15

III

In view of our ruling on apparent authority, it becomes necessary to address whether Gordon's online engagement in purchasing the tickets actually resulted in a contract that included the Washington Football Team's terms and conditions and arbitration clause. And that, in turn, required that the defendants have shown (1) that the interface design for the purchase of the tickets provided Gordon with actual or constructive notice of the Washington Football Team's terms and conditions and (2) that Gordon assented to those terms and conditions, as necessary for the formation of a contract. *See DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 635 (Md. 2003); *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88–89 (4th Cir. 2016).

The district court fairly set forth the legal principles governing those requirements in the context of contract formation on the Internet, *see Naimoli*, 692 F. Supp. 3d at 508, which appear consistent with our recent decision in *Marshall*. In *Marshall*, we explained that traditional contract requirements apply to contracts formed on the Internet and that the person asserting the contract's existence must demonstrate that the person alleged to be bound by the contract (1) had "reasonable notice of an offer" to enter into the contract and (2) "manifested" assent to it. *Marshall*, 112 F.4th at 218. While notice can be actual or constructive, "in the internet context, the traditional notice inquiry focuses on the design and content of the relevant interface and asks whether it would put a reasonably prudent user on notice of a contract on offer and its terms." *Id*. at 218–19 (cleaned up). "Offers and terms that are made reasonably conspicuous generally will satisfy this standard." *Id*. at 219 (cleaned up). We explained, however, that constructive notice cannot be presumed

16

if obtaining it requires clicking all available boxes on the computer screen. Stated otherwise, "we cannot presume that a person who clicks on a box that appears on a digital screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Id.* (alteration omitted) (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016)); *see also Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). We explained that the duty-to-read principle that is applicable to traditional contracts must take account of the realities of the Internet where readers reasonably do not often scroll down or follow links presented. As we noted in *Marshall*, "'the duty to read does not morph into a duty to ferret out contract provisions when they are contained in inconspicuous hyperlinks,' or can be found only by scrolling down through additional screens." *Marshall*, 112 F.4th at 220 (quoting *Starke*, 913 F.3d at 295); *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002).

In this case, the district court found that the facts necessary to apply the legal principles of online contract formation were in dispute, as each side gave different accounts of how, if at all, the websites displayed the Washington Football Team's terms and conditions. And because the question of contract formation turns on this factual dispute, we remand for resolution of whether Gordon's online engagement in purchasing the tickets resulted in a contract with the Washington Football Team that included its terms and conditions and the arbitration clause in particular.

On remand, the court will continue to have before it the defendants' motion to compel arbitration and to be governed procedurally by the Federal Arbitration Act, which

17

provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."  9 U.S.C. § 6.  As the Supreme Court has noted, this "directive to a federal court to treat arbitration applications 'in the manner provided by law' for all other motions is simply a command to apply the usual federal procedural rules."  *Morgan*, 596 U.S. at 419.  Thus, a district court may resolve the relevant factual disputes by, as necessary, affording targeted discovery, conducting an evidentiary hearing, conducting a summary trial, making findings of fact and conclusions of law, all as necessary and appropriate to resolve the motion.  *See, e.g.*, *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 816 F.2d 864, 868–69 (2d Cir. 1987).  But in doing so, it must recognize that the Federal Arbitration Act "calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 29 (1983).

On remand, the district court thus should conduct such proceedings as necessary to resolve the disputed facts that, in this case, are necessary to determine whether Gordon entered into a contract with the Washington Football Team that included its terms and conditions and the arbitration clause.

\*     \*     \*

Accordingly, we vacate the district court's order denying arbitration; we reverse its ruling on Gordon's apparent authority; and we remand the case for further proceedings as noted.

IT IS SO ORDERED.

18