Moore v. Brooks, 2026 NCBC 52.

STATE OF NORTH CAROLINA

DURHAM COUNTY

KELLY F. MOORE, individually and
as Executor of the ESTATE OF
DRUE A. MOORE; MILES MOORE,
individually and on behalf of his
minor brother, COLE MOORE; KMC
MOORE LLC, as Trustee of the
REDWOOD TRUST, u/a/d April 10,
2017; and RICK GRAVES, as Trustee
of the REDWOOD LIFE
INSURANCE TRUST u/a/d
November 15, 2018,

            Plaintiffs,

v.

ROBERT SCOTT BROOKS and
WINTHROP INTELLIGENCE, LLC,

            Defendants.

---

ROBERT SCOTT BROOKS and
WINTHROP INTELLIGENCE, LLC

            Crossclaim
            Plaintiffs,

v.

REDWOOD WI HOLDINGS, LLC

            Crossclaim
            Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001214-310

**ORDER AND OPINION ON
DEFENDANT WINTHROP
INTELLIGENCE LLC'S MOTION TO
COMPEL ARBITRATION OF
COUNTERCLAIMS AND
CROSSCLAIMS**

1. This matter is before the Court on defendant Winthrop Intelligence, LLC's motion to compel arbitration of certain of its counterclaims and crossclaims. (ECF No. 97).

2. The motion has been fully briefed, and the Court held a hearing at which the parties were represented by their counsel of record. (ECF No. 155).

3. For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Winthrop's motion.

*Ward and Smith, P.A., by E. Bradley Evans, Gavin B. Parsons, and Jordan Spanner, for Plaintiffs Kelly F. Moore, individually and as Executor of the Estate of Drue A. Moore; Miles Moore, individually and on behalf of his minor brother, Cole Moore; KMC Moore LLC, as trustee of the Redwood Trust, u/a/d April 10, 2017; Rick Graves, as trustee of the Redwood Life Insurance Trust u/a/d November 15, 2018; and Crossclaim Defendant Redwood WI Holdings, LLC.*

*Everett Gaskins Hancock Tuttle Hash LLP, by E.D. Gaskins and James M. Hash, for Defendants Robert Scott Brooks and Winthrop Intelligence, LLC.*

Houston, Judge.

## I.    BACKGROUND

4. The Court does not recite here every fact in the record. Rather, the Court makes only those findings of fact reasonably necessary to reach its determination in this matter. Nonetheless, and regardless of whether it is specifically recited in this Order, the Court has considered all competent evidence of record in resolving the motion and has excluded any matters not properly introduced or otherwise not properly before the Court. Where the Court makes a finding of fact from conflicting evidence, the Court's findings of fact reflect the Court's determination (in its discretion as the fact finder) of the evidence it finds most credible or convincing.

5. Defendant Winthrop Intelligence, LLC was originally formed prior to 2017 as a Delaware limited liability company with its original members,

cousins Drue and Ben Moore, each holding a fifty percent interest. (ECF No. 97.1, ¶ 3).

6.     In 2017, Drue and Ben made several changes surrounding Winthrop, including (i) naming D. Scott Robinson (an attorney) the manager of Winthrop, (ii) converting Winthrop to a Wyoming LLC; (iii) creating two Wyoming trusts to hold their respective membership interests in Winthrop (the Redwood Trust for Drue's interest and the Cushman Trust for Ben's interest); and (iv) adopting Winthrop's Amended and Restated Operating Agreement, effective 1 August 2017 ("**2017 Operating Agreement**"). (ECF No. 97.1, ¶¶ 2, 4–6; ECF No. 41.3).

7.     Robinson's company, Opes Directed Fiduciary Services, LLC ("**Opes**") served as trustee of the Redwood Trust and the Cushman Trust. (ECF No. 97.1, ¶ 5).

8.     In 2020, Drue and Ben sought to transfer their indirect interests in Winthrop (via the Redwood Trust and the Cushman Trust, respectively) to new Wyoming limited liability companies, Redwood WI Holdings, LLC (for Drue) and Cushman WI Holdings, LLC (for Ben). (ECF No. 97.1, ¶ 7).

9.     Accordingly, Robinson—as president of Opes (the trustee of the Redwood Trust and the Cushman Trust)—effectuated the transaction, transferring those interests in Winthrop (i) from the Redwood Trust to Redwood WI Holdings (ECF No. 97.1, ¶¶ 8–9; *see also* ECF No. 60.1), and (ii) from the Cushman Trust to Cushman WI Holdings, (ECF No. 97.1, ¶ 7).

10. Several weeks after the transfers, in March 2020, Winthrop's then-new members—Redwood WI Holdings and Cushman WI Holdings—approved an "Amended and Restated Operating Agreement of Winthrop Intelligence, LLC" (the "**2020 Operating Agreement**"). (ECF No. 97.1, ¶ 10; ECF No. 41.4). Robinson signed that document three times: once as manager for Winthrop and once each as manager of Redwood WI Holdings and manager of Cushman WI Holdings. (ECF No. 97.1, ¶ 10; ECF No. 41.4 at 18).

11. The 2020 Operating Agreement contains an arbitration provision, providing in relevant part as follows:

> It is the desire of the Members that any dispute between any Member and the Company or another Member concerning the Company or this Agreement be settled in a reasonable, fair, and timely manner without outside intervention if possible, and if not, by arbitration.
> . . . .
> The arbitration of any dispute is to be handled by a single arbitrator, using the rules of commercial arbitration of the American Arbitration Association. Arbitration will occur in the state in which the Company's principal office is located. The parties will be entitled to conduct discovery in accordance with the Federal Rules of Civil Procedure, subject to limitation by the arbitrator in order to secure just and efficient resolution of the dispute. If the amount in controversy exceeds $10,000, the arbitrator's decision must include a statement specifying in reasonable detail the basis for and computation of the amount of the award, if any. A party substantially prevailing in the arbitration will also be entitled to recover such amount for its costs and attorneys' fees in connection with the arbitration as may be determined by the arbitrator. Judgment on the arbitration award may be entered in any court having jurisdiction.

(ECF No. 41.4, §§ 20.1, 20.3).

12. Cushman WI Holdings's interest in Winthrop was subsequently

assigned to a different entity, Sine Nominee LLC, for which Robinson also served as manager. (ECF No. 97.1, ¶ 11).

13. In August 2024, Robinson executed a new operating agreement (the "**2024 Operating Agreement**," and, with the 2020 Operating Agreement, the "**Operating Agreements**"). (ECF No. 97.1, ¶ 13; ECF No. 41.6). That document identifies Redwood WI Holdings and Sine Nominee as the members of Winthrop. (ECF No. 41.6; ECF No. 97.1, ¶ 13). Unlike with the 2020 Operating Agreement, Robinson affixed his own name to the 2024 Operating Agreement only twice—once as manager of Winthrop and once as manager of Sine Nominee. (ECF No. 41.6 at 18).

14. Drue Moore's signature is also affixed to the 2024 Operating Agreement as manager of Redwood WI Holdings.[1] Robinson affixed that signature on Drue's behalf with Drue's knowledge and consent. (ECF No. 41.6 at 18; ECF No. 97.1, ¶ 13).

15. The 2024 Operating Agreement contains an arbitration provision that is, in all material respects, the same as the provision in the 2020 Operating Agreement. (*Compare* ECF No. 41.4, §§ 20.1, 20.3, *with* ECF No. 41.6, §§ 20.1, 20.3).

---

[1] In his affidavit, (ECF No. 97.1), Robinson indicates that he affixed Drue's signature to the 2024 Operating Agreement on behalf of "*Winthrop* WI Holdings LLC." (ECF No. 97.1, ¶ 13 (emphasis added)). The reference to "Winthrop WI Holdings LLC" is an apparent scrivener's error, as the document itself reflects that Drue signed as "Manager" of *Redwood* WI Holdings, LLC, (ECF No. 41.6 at 18).

16. Drue Moore died in January 2025, and his widow, Kelly F. Moore, serves as executor of his estate (the "**Estate**").

17. Neither the Estate nor the Redwood Trust is listed on the face of either of the Operating Agreements as a party to those agreements, nor is there any indication in the documents that either the Estate or the Redwood Trust intended to be bound by the Operating Agreements.

18. By 2024, the various personal relationships surrounding Winthrop and its members and managers had soured, and Robinson and attorney Robert Scott Brooks (Chief Investment and Financial Officer of Winthrop) accused Drue of embezzling millions of dollars from Winthrop. (ECF No. 85.4, ¶ 5; *see generally* ECF Nos. 3, 116.1 and 137). By that time, Drue served as the manager of Redwood WI Holdings, a position he assumed from Robinson on 1 January 2021. (ECF No. 85.3, ¶ 5; ECF No. 97.1, ¶ 8).

19. Winthrop previously moved to compel arbitration of Plaintiffs' affirmative claims against it, primarily based on the 2024 Operating Agreement. (ECF No. 40). Winthrop failed to provide any evidence in support of the motion, so the Court denied it. (*See generally* ECF No. 78).

20. Winthrop filed its original answer, counterclaims, and crossclaims on 2 September 2025. (ECF No. 85). Thereafter, Winthrop moved to compel arbitration of its causes of action against the Estate, the Redwood Trust, and Redwood WI Holdings. (ECF No. 97).

21. On 22 October 2025, Winthrop amended its counterclaims and crossclaims. In doing so, Winthrop retained two of the causes of action asserted in its original counterclaims and crossclaims against the Estate, the Redwood Trust, and Redwood WI Holdings: (i) breach of operating agreement and (ii) expulsion of Redwood WI Holdings under the Operating Agreements. (*Compare* ECF No. 85, Counterclaims and Crossclaims, ¶¶ 41–55, *with* ECF No. 116, ¶¶ 116–132). However, Winthrop also added numerous new putative causes of action for embezzlement, breach of fiduciary duty, conversion, money owed, unjust enrichment, accounting, equitable lien, voidable conveyances, statutory wrongful distribution, and piercing the corporate veil, and omitted Winthrop's prior cause of action for breach of the Operating Agreements for refusal to arbitrate. (*See* ECF No. 116).

22. Following several extensions, the motion was fully briefed, and the Court held a hearing on the motion, with counsel for all parties present. (*See* ECF No. 155).

23. Winthrop has not filed a renewed motion to compel arbitration in light of its amended filing, but counsel for the parties stipulated in open court that the motion would be treated as timely filed and as if it were filed with respect to, and applicable to, the amended counterclaims and crossclaims encompassed within the motion (i.e., the amended counterclaims and

crossclaims for breach of contract and expulsion under the Operating Agreements, which were asserted in the original pleading).[2]

24. The Operating Agreements are in writing and contain the arbitration provisions noted above.

25. On their face, the Operating Agreements are agreements to arbitrate.

26. Winthrop and Redwood WI Holdings are identified as parties on the face of the Operating Agreements. However, neither the Estate nor the Redwood Trust is listed on the face of either Operating Agreement as a party.

27. Since before the 2017 Operating Agreement, Drue (and by extension, the Estate) has not been a party to any Winthrop operating agreement. (*See generally* ECF Nos. 41.3, 41.4, and 41.6; *see also* ECF No. 97.1, ¶¶ 6, 12–13 (authenticating ECF Nos. 41.3, 41.4, and 41.6)). Likewise, since before the 2020 Operating Agreement, the Redwood Trust has not been a member of Winthrop. (ECF Nos. 41.4, and 41.6). Thus, neither was a member when the Operating Agreements were signed. (ECF No. 41.4 at 1; ECF No. 41.6 at 1).

28. While Winthrop has introduced evidence that Drue made financial transfers from Winthrop's accounts to other accounts and that certain financial transactions were self-interested, (*see generally* ECF No. 116.1), for purposes

---

[2] Ordinarily, as the Estate, the Redwood Trust, and Redwood WI Holdings correctly argued initially, Winthrop's motion to compel arbitration of the original causes of action would have been mooted by the filing of the amended counterclaims and crossclaims. (ECF No. 137 at 2, 14 (quoting *Woody v. Vickrey*, 276 N.C. App. 427, 440 (2021))). Based on the stipulation and agreement of the parties and in its discretion, however, the Court will consider the motion on the merits as if timely filed with respect to the first and second amended, but reasserted, causes of action.

of evaluating the present motion to compel arbitration only, the Court finds that the evidence does not rise to the level of demonstrating that Drue ultimately dominated and controlled the Redwood Trust or Redwood WI Holdings or that those entities were effectively indistinguishable from Drue such that they were his alter egos. Even if it did, however, the record does not indicate that Drue's conduct was unjust, unfair, or inequitable with respect to the Operating Agreements forming the basis of the motion.

29. Winthrop seeks to compel arbitration of its amended counterclaims and crossclaims for breach of contract and expulsion of Redwood WI Holdings under the Operating Agreements.

30. The Estate, the Redwood Trust, and Redwood WI Holdings have refused to arbitrate the dispute with Winthrop, despite Winthrop's demand to arbitrate, and have submitted briefing and evidence in opposition to the motion to compel arbitration.

## II. ANALYSIS

### a. Standards to Compel Arbitration

31. Under applicable law, "[a] presumption in favor of arbitration exists," and "[a]ny doubts regarding the scope of arbitrable issues should be resolved in favor of arbitration." *Hobbs Staffing Servs. v. Lumbermens Mut. Cas. Co.*, 168 N.C. App. 223, 225 (2005) (citations omitted).

32. "The Federal Arbitration Act (FAA) mandates the enforcement of arbitration agreements and is enforceable in both state and federal

courts." *Park v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 159 N.C. App. 120, 122 (2003) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)); *Charles Schwab & Co. v. Marilley*, 2024 NCBC LEXIS 27, *9 (N.C. Super. Ct. Feb. 20, 2024) ("Section 2 of the FAA provides: '[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]'" (quoting 9 U.S.C. § 2)).

33. Similarly, the North Carolina Revised Uniform Arbitration Act, N.C. Gen. Stat. § 1-569.1 *et seq.* ("**NCRUAA**"), provides that "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for revoking a contract." N.C. Gen. Stat. § 1-569.6(a).

34. Under the FAA, an allegation that an agreement involves interstate commerce creates a rebuttable presumption of such commerce, with the burden shifting to the opposing party to rebut the presumption. *Earnhardt Plumbing, LLC v. Thomas Builders, Inc.*, – N.C. App. –, 924 S.E.2d 844, 849 (2025).

35. Here, Winthrop contends, and no one disputes, that the arbitration provisions at issue are "part of a written agreement involving commerce[.]" (ECF No. 98 at 13). "The agreements at issue concern the ownership and

management of a [company] doing business in multiple states. Thus, the agreements involve interstate commerce and are governed by the FAA" pursuant to the Operating Agreements. *Local Soc., Inc. v. Stallings*, 2017 NCBC LEXIS 94, at *9–10 (N.C. Super. Ct. Oct. 9, 2017) (internal citations omitted).

36.    The FAA governs the substance of this dispute, while the NCRUAA governs procedure before the Court, as Winthrop recognizes in moving to compel arbitration pursuant to N.C. Gen. Stat. § 1-569.7. *Carter v. TD Ameritrade Holding Corp.*, 218 N.C. App. 222, 226 (2012) (explaining that state law controls procedural considerations in motions to compel arbitration since § 3 and § 4 of the FAA, which govern procedural matters, do not apply in state court (citing *Blow v. Shaughnessy*, 68 N.C. App. 1, 17 (1984), and *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.10 (1984))).

37.    Under the NCRUAA, "[o]n motion of a person *showing an agreement to arbitrate* and alleging another person's refusal to arbitrate pursuant to the agreement," a court is required to "proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate." N.C. Gen. Stat. § 1-569.7; *see Charles Schwab*, 2024 NCBC LEXIS 27, at *10 (holding that state and federal law both require "the existence of a valid agreement to arbitrate before compelling the arbitration of any dispute" (citations omitted)).

38. As a threshold inquiry, when considering a motion to compel arbitration, "[f]irst, courts determine who decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if the court concludes that the court is the proper forum in which to adjudicate arbitrability, the court then decides whether the dispute is, in fact, arbitrable." *Howell v. Heafner*, 2020 NCBC LEXIS 105, at *16–17 (N.C. Super. Ct. Sept. 11, 2020) (quoting *Rickenbaugh v. Power Home Solar, LLC*, 2019 NCBC LEXIS 109, at *10 (N.C. Super. Ct. Dec. 20, 2019) (internal marks and quotations omitted)).

39. If the parties delegated to an arbitrator the authority to decide whether a dispute is arbitrable, the court then defers further determinations on the merits of the action. *Howell*, 2020 NCBC LEXIS 105, at *17–18; *Hall v. Dancy*, 2018 NCBC LEXIS 63, at *7–8 (N.C. Super. Ct. July 27, 2018).

40. In contrast, if the court should determine arbitrability, there is "a two-step analysis . . . to ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether the specific dispute falls within the substantive scope of that agreement." *Terrell v. Kernersville Chrysler Dodge, LLC*, 252 N.C. App. 414, 418–19 (2017) (quoting *Slaughter v. Swicegood*, 162 N.C. App. 457, 461 (2004)).

41. As a general rule, "courts presume that the parties intend courts, not arbitrators, to decide what . . . have [been] called disputes about 'arbitrability.'" *BG Grp. PLC v. Republic of Arg.*, 572 U.S. 25, 34 (2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). However, "parties can, and

often do, delegate arbitrability to the arbitrator." *Howell*, 2020 NCBC LEXIS 105, at \*17 (citation omitted).

42. Substantive arbitrability, including questions such as whether "a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement" can be delegated to the arbitrator under the FAA by showing "that the parties 'clearly and unmistakably' intended for an arbitrator, instead of a court, to decide issues of substantive arbitrability." *Bailey v. Ford Motor Co.*, 244 N.C. App. 346, 352–53 (2015) (citation omitted); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (citations omitted)).

43. The American Arbitration Association ("**AAA**") Commercial Rules specifically provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the *arbitrability of any claim or counterclaim*, without any need to refer such matters first to a court." Rule 7(a), Jurisdiction, *AAA Commercial Arbitration Rules & Mediation Procedures* (emphasis added).

44. Where the parties expressly incorporate the AAA Commercial Rules, or a similar set of arbitration rules that provide for the arbitrator's resolution of substantive arbitrability issues, this constitutes a "clear[] and

unmistakabl[e]" sign that the parties intended to delegate substantive arbitrability to the arbitrator. *Howell*, 2020 NCBC LEXIS 105, at \*17–18 ("Because Rule 7(a) of the AAA Commercial Rules provides that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the *arbitrability of any claim or counterclaim*[,]' . . . the Court concludes that the IMA Plaintiffs and the Corporate Defendants clearly and unmistakably delegated issues of arbitrability to the arbitrator." (citations omitted)); *AP Atl., Inc. v. Crescent Univ. City Venture, LLC*, 2016 NCBC LEXIS 60, at \*16 (N.C. Super. Ct. July 28, 2016) ("[B]y incorporating the [AAA] Employment Rules, 'the parties agreed the arbitrator should decide issues of substantive arbitrability.'" (quoting *Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 63–64 (2016))).

### b. <u>Arbitration Agreement Between Winthrop and Redwood WI Holdings</u>

45. With their plain language, the Operating Agreements between Winthrop and Redwood WI Holdings contain arbitration provisions incorporating the AAA Commercial Rules and those Rules' provisions providing for the arbitrator's determination of substantive issues. (ECF No. 41.4, §§ 20.1, 20.3; ECF No. 41.6, §§ 20.1, 20.3); *see also* Rule 7(a), Jurisdiction, *AAA Commercial Arbitration Rules & Mediation Procedures*.

46. While the Estate, the Redwood Trust, and Redwood WI Holdings raise various arguments about the overall validity of the Operating

Agreements, including the validity of signatures on the documents, they do not dispute the existence of the arbitration agreements and concede that the Operating Agreements with arbitration provisions were signed on behalf of Redwood WI Holdings, Winthrop, and Sine Nominee. (*See, e.g.*, ECF No. 137 at 4–5 (acknowledging that the 2020 Operating Agreement "is signed by Robinson as manager of each Winthrop, Redwood WI Holdings, and Cushman WI Holdings" and that the 2024 Operating Agreement "is signed by Robinson as manager of each Winthrop and Sine Nominee LLC, and by Drue—not Robinson—as manager of Redwood WI Holdings")). And the record confirms as much: the Operating Agreements constitute agreements to arbitrate.[3]

47.    While a party may dispute the enforceability of an otherwise "clear and unmistakable delegation" by challenging the specific delegation provision, such as incorporation of AAA rules, wholesale challenges to the validity of the entire contract generally are not a basis on which to invalidate the parties' delegation of determinations of substantive arbitrability. *See, e.g.*, *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010); *Howell*, 2020 NCBC LEXIS 105, at *20–23 (suggesting that a party must make a distinct challenge to the provision's delegation clause to avoid its effect).

---

[3] To be clear, as set forth below, the Court makes no determination as to whether the Operating Agreements are binding or valid. Rather, the Court determines simply that there is facially an "agreement to arbitrate" as between Winthrop and Redwood WI Holdings. N.C. Gen. Stat. § 1-569.7. The validity of that agreement is appropriately referred to the arbitrator as an issue of substantive arbitrability. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded.").

48. In this case, the Estate, the Redwood Trust, and Redwood WI Holdings do not specifically challenge delegation of substantive arbitrability or the validity of the potential delegation in general. (*See generally* ECF No. 137). Instead, they broadly challenge the validity of the entirety of the Operating Agreements. (*See generally* ECF No. 137).

49. The Operating Agreements facially identify Winthrop and Redwood WI Holdings as parties; contain a mandatory arbitration provision requiring the parties to arbitrate under AAA rules; and therefore delegate determinations of substantive arbitrability to the arbitrator.

50. This determination, plus Redwood WI Holdings' undisputed refusal to arbitrate, is sufficient to satisfy the Court's determination requirements under N.C. Gen. Stat. § 1-569.7.

51. Considering all appropriate matters of record, the Court determines that there has been a "clear and unmistakable" delegation of substantive arbitrability to the arbitrator. *See Howell*, 2020 NCBC LEXIS 105, at *17–18; *Hall*, 2018 NCBC LEXIS 63, at *6–7.

52. To the extent the Estate, the Redwood Trust, and Redwood WI Holdings dispute the ultimate validity of the Operating Agreements, they are not without options. Whether the Operating Agreements are ultimately valid and binding is a substantive issue to be resolved by the arbitrator. *AP Atl.*, 2016 NCBC LEXIS 60, at *16; *see Hall*, 2018 NCBC LEXIS 63, at *6–7 ("Under either the FAA or the North Carolina Act, when the parties' arbitration

agreement specifically incorporates the American Arbitration Association ('AAA') rules, such incorporation demonstrates that the parties clearly and unmistakably intended for the arbitrator to resolve disputes regarding arbitrability." (citations omitted)); *see also Buckeye Check Cashing*, 546 U.S. at 444 n.1; *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985) ("Generally, parties are free to contract to anything as long as it is not illegal, unconscionable, or against the public interest." (citation omitted)). Thus, the parties retain the opportunity to present those arguments to the arbitrator and to contest confirmation of a potential arbitration award if applicable.

53. Accordingly, the Court **GRANTS** Winthrop's motion to compel arbitration to the extent the motion pertains to its crossclaims against Redwood WI Holdings for breach of operating agreement and expulsion pursuant to operating agreement. (ECF No. 116 at 23–26).

c. <u>**Proceedings as to Non-Signatories of the Operating Agreements**</u>

54. In addition to its crossclaims against Redwood WI Holdings, Winthrop also seeks to compel arbitration of its causes of action against the Redwood Trust and the Estate, requesting that the Court either (i) defer to the arbitrator as to whether those parties are bound by the Operating Agreements arbitration provisions or (ii) alternatively, affirmatively determine that they are so bound.

55. While the validity of an arbitration agreement is a question of substantive arbitrability that may be delegated to an arbitrator, "*a court*, not

an arbitrator . . . must initially decide whether a nonparty" is bound by or has recourse under a putative arbitration agreement, regardless of any delegation provision therein. *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 286 (4th Cir. 2023) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–32 (2009)).[4]

56.     Generally, a non-party is not bound by a contract to which it is not a party. *Barrow v. Murphrey*, 95 N.C. App. 738, 741 (1989) (quoting *Insurance Co. v. Chantos*, 293 N.C. 431, 438 (1977)); *Richardson Assocs. v. Lincoln-Devore*, 806 P.2d 790, 806–07 (Wyo. 1991) (citation omitted) ("It is elemental that . . . no one but the parties to the contract can be bound by it or obtain rights under it.").

57.     Here, unlike with Winthrop's causes of action against Redwood WI Holdings, where both parties are identified on the face of the Operating Agreements, neither the Redwood Trust nor the Estate is identified on the face of the Operating Agreements, nor is there otherwise any basis upon which the Court might reasonably conclude that it is appropriate to compel arbitration

---

[4] At the federal level, there is a circuit split as to this issue. *Compare Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 211 (2d Cir. 2005); *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 144 (3rd Cir. 2022); *and Casa Arena Blanca LLC v. Rainwater ex rel. Est. of Green*, 2022 U.S. App. LEXIS 7473, 2022 WL 839800, at *4 (10th Cir. Mar. 22, 2022) (unpublished), *with Rogers*, 76 F.4th at 283; *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014); *and Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013). Like North Carolina's appellate courts in similar circumstances, this Court determines that it is appropriate to follow the approach adopted by the Fourth Circuit Court of Appeals. *E.g.*, *Snipes v. Titlemax of Va.*, 285 N.C. App. 176, 186–87 (2022) (following the Fourth Circuit's approach to the FAA).

as to those parties under the circumstances.

58.     Thus, absent an applicable exception to general contract and arbitration law, there is no evidence of an "agreement to arbitrate" as between Winthrop and either the Estate or the Redwood Trust. *See* N.C. Gen. Stat. § 1-569.7.

59.     As arbitration agreements are creations of contract law, "traditional principles of state law allow [an arbitration agreement] to be enforced by or against nonparties to the contract through" various state contract law doctrines. *Arthur Andersen*, 556 U.S. at 631 (citation and internal punctuation omitted). The laws of North Carolina and Wyoming, for example, contemplate certain exceptions allowing non-parties to be bound to arbitration provisions. *See, e.g.*, *Pennaco Energy, Inc. v. KD Co.*, 363 P.3d 18, 23 (Wyo. 2015) (delegation); *In re Southeastern Eye Ctr.*, 2019 NCBC LEXIS 29, at *124 (N.C. Super. Ct. May 7, 2019) (same).

60.     Winthrop contends that the Court should conclude that the Redwood Trust and the Estate are bound by the Operating Agreements under state law doctrines of (i) delegation, (ii) piercing the veil/alter ego, or (iii) ratification through acceptance of benefits/estoppel. (ECF No. 98 at 18–19; ECF No. 153 at 11–14).

61.     Quite simply, however, these doctrines do not bind the Estate or the Redwood Trust to Operating Agreements to which they were not parties.

62. As they correctly point out, the Estate and the Redwood Trust cannot delegate or assign duties under contracts to which they were not parties (i.e., the Operating Agreements at issue) and otherwise have no assignment or delegation rights. (ECF No. 137 at 26–27); *Pennaco Energy*, 363 P.3d at 23 (addressing the doctrine of delegation in Wyoming); *Southeastern Eye Ctr.*, 2019 NCBC LEXIS 29, at *124 (addressing the doctrine of delegation in North Carolina).

63. Similarly, under both North Carolina law and Wyoming law, Winthrop has failed to show that the Estate, the Redwood Trust, and Redwood WI Holdings are alter egos of each other or Drue Moore such that Winthrop is entitled to the remedy of piercing the veil for purposes of enforcing the arbitration provisions against non-parties to the Operating Agreements. *GreenHunter Energy, Inc. v. W. Ecosystem Tech., Inc.*, 337 P.3d 454, 462 (Wyo. 2014) (addressing veil piercing under Wyoming law); *Estate of Rivas v. Fred Smith Constr., Inc.*, 258 N.C. App. 13, 15–16 (2018) (same under North Carolina law).

64. While Winthrop makes sweeping assertions that "Drue Moore used the Redwood Trust and its subsidiary, Redwood WI Holdings, as mere instrumentalities to misappropriate funds from Winthrop and shield himself from liability" and that "Drue commingled assets, abused corporate forms, and exercised dominion and control over the Trust and its entities for his personal

benefit," (ECF No. 153 at 13), those assertions are not supported by adequate evidence that is convincing to the Court.

65. Indeed, Winthrop itself notes that "the facts supporting an alter ego theory will be further developed as this matter progresses," implicitly conceding that it lacks such evidence now. (ECF No. 98 at 20). Given that Winthrop bears the burden of demonstrating an arbitration agreement to which the parties are bound, it may not rely on conclusory assertions and minimal evidence of asset commingling. *See* N.C. Gen. Stat. § 1-569.7 (directing courts to compel arbitration "[o]n motion of a person showing an agreement to arbitrate" where the moving party has satisfied its burden of showing an agreement to arbitrate); *see GreenHunter Energy*, 337 P.3d at 462–64; *Rivas*, 258 N.C. App. at 16–17 ("Plaintiffs' evidence was insufficient to create a genuine issue of material fact regarding the alleged alter ego relationship.").

66. Finally, Winthrop argues that the Estate and Redwood Trust should be bound to the Operating Agreements' arbitration provisions under the doctrine of estoppel through acceptance of benefits because they accepted the "benefits" of membership in Winthrop. (ECF No. 153 at 12); *see Carolina Medicorp v. Bd. of Trs. of the Tchrs.' & State Emps.' Comprehensive Major Med. Plan*, 118 N.C. App. 485, 492–93 (1995) (citations omitted); *see also Brooks v. Hackney*, 329 N.C. 166, 173 (1991); *Black v. De Black*, 1 P.3d 1244, 1250 (Wyo. 2000) (addressing the doctrine in the limited context of divorce decrees under

Wyoming law). Once again, however, the doctrine is inapplicable under the facts of this case. As articulated in the opposition briefing, the record does not support that the Redwood Trust or the Estate (through Drue) accepted benefits arising under or pursuant to the Operating Agreements as opposed to allegedly misappropriating funds outside the scope of the Operating Agreements. (ECF No. 137 at 28).

67. Ultimately, considering applicable law and all appropriate matters of record, the Court concludes that Winthrop has failed to show "an agreement to arbitrate" as between Winthrop and the Estate or the Redwood Trust and that Winthrop has otherwise failed to demonstrate that the claims at issue are arbitrable as against those parties. *See* N.C. Gen. Stat. § 1-569.7.

68. The Court therefore **DENIES** Winthrop's motion to compel arbitration of its causes of action against the Estate and the Redwood Trust.

### III.   CONCLUSIONS

69. Therefore, having considered the motion, the competent evidence of record, the arguments of counsel, and all other appropriate matters of record, the Court **GRANTS in part** and **DENIES in part** Winthrop's motion as follows:

a.   Winthrop's motion to compel arbitration of its causes of action against Redwood WI Holdings, LLC for (i) breach of operating agreement and (ii) expulsion of Redwood WI Holdings under the Operating Agreements is **GRANTED**, and those causes of action, (ECF No. 116 at 23–

26), are **REFERRED** to arbitration. The parties are **DIRECTED** to take all efforts necessary to commence arbitration of those causes of action within thirty (30) days of entry of this Order and are **DIRECTED** to cooperate in good faith in doing so;

b. All proceedings in this action with respect to Winthrop's causes of action against Redwood WI Holdings that have been referred to arbitration are **STAYED** until ordered otherwise by the Court; and

c. Except as granted above, Winthrop's motion is **DENIED**.

**SO ORDERED**, this 9th day of June 2026.

/s/ Matthew T. Houston

Matthew T. Houston
Special Superior Court Judge
for Complex Business Cases